MICHIGAN STATE AFL-CIO v EMPLOYMENT RELATIONS COMMISSION

MICHIGAN EDUCATION ASSOCIATION v GOVERNOR

Docket Nos. 103918, 103937, 103938. Argued April 11, 1996 (Calendar Nos. 8-9). Decided August 2, 1996.

Michigan State AFL-CIO and others brought an action in the Wayne Circuit Court against the Employment Relations Commission, seeking a declaration that 1994 PA 112, which amended the public employment relations act to address collective bargaining, mediation, and strike activities by public school employees in a manner separate from the general body of public employees, is unconstitutional. The Michigan Education Association and others brought a similar action in Wayne Circuit Court against the Governor and the Employment Relations Commission. The actions were consolidated. The court, Louis F. Simmons, Jr., J., denied the plaintiffs' motion for summary disposition except with regard to subsections 2a(4) and 2a(10) of the act, and granted summary disposition for the defendants on the remaining claims. The Court of Appeals, MACKENZIE, P.J., and CORRIGAN and P. J. CLULO, JJ., affirmed in an opinion per curiam (Docket Nos. 184125, 184126, 184227). The plaintiffs appeal.

In an opinion by Justice MALLETT, joined by Justices CAVANAGH and BOYLE, § 17 of 1994 PA 112 would be found unconstitutional. In an opinion by Justice LEVIN, the constitutionality of § 17 is not decided. In an opinion by Justice MALLETT, joined by Justices CAVANAGH and BOYLE, and an opinion by Justice LEVIN, the Supreme Court vacated the portions of the Court of Appeals and the trial court opinions that find § 17 of 1994 PA 112 constitutional. In an opinion by Chief Justice BRICKLEY, joined by Justices RILEY and WEAVER, § 17 would be found constitutional. In the absence of the ability to garner a majority to find § 17 constitutional or unconstitutional, § 17 remains a valid and binding statutory provision.

In an opinion by Chief Justice BRICKLEY, joined by Justices RILEY and WEAVER, and an opinion by Justice MALLETT, joined by Justices CAVANAGH and BOYLE, and an opinion by Justice LEVIN, the Supreme Court unanimously *held*:

1. Subsections 15(3) and (4) remove the statutory requirement that public school employers must listen to their employees with

regard to nine classified subjects and instructs employers not to bargain with regard to those subjects. The classification does not implicate First Amendment rights. Further, public school employees are not a protected class, requiring rational basis review. A statute will be upheld under the rational basis standard if it furthers a legitimate government interest and if the challenged classification is rationally related to achieving the interest. The classifications at issue are rationally related to the purpose of reducing strikes by public school employees, surviving equal protection challenge.

2. Subsections 1(1)(i) and 6(1) define "strike" in relation to the motivation for a work stoppage. As applied to public school employees, the list of prohibited motivations includes protesting unfair labor practices. The act of striking, unlike the act of picketing, is not sufficiently communicative to enjoy First Amendment protection. Prohibition of strike activity on the basis of motivation does not violate the First Amendment, regardless of the type of motivation singled out.

3. Subsection 1(2) does not punish conduct; rather, it instructs courts respecting interpretation of the PERA and alone cannot violate free speech. Additionally, it voluntarily limits the PERA's impairment of employee expression or communication. Even if this subsection's protection were not as extensive as the protection guaranteed under the First Amendment, the First Amendment would protect employee speech.

4. The definitions of strike in subsection 2a and 6(1) are consistent. Although subsection 6(1) requires concerted action, a strike also obtains if a group of employees aids one employee's effort to engage in work stoppage. Therefore, the reference to a strike by one or more public school employees in subsection 2a(1) does not conflict with the definition of strike in subsection 6(1) because subsection 6(1) recognizes strikes in which only one employee abstains from work.

Justice LEVIN, writing separately, joined in vacating the decision of the Court of Appeals insofar as it held § 17 to be constitutional for reasons stated by the United States Supreme Court in *Public Affairs Associates, Inc v Rickover*, 369 US 111 (1962), and *Eccles v Peoples Bank*, 333 US 426 (1948), which cautioned against declaratory judgments on issues of public moment, even falling short of constitutionality, in speculative situations. In these cases a factual record is nonexistent, and thus is even more fragile than the record described in *Rickover*.

Although the opinion that would affirm the Court of Appeals declaration of constitutionality would adopt a narrow construction of § 17 that perhaps would not impermissibly trample upon the asso-

ciational rights of union members, there cannot be confidence, on the basis of the record so far developed, that such a construction is either correct or may dependably be relied on.

Some of the language of § 17, at least initially, seems to be clear on its face. There can be little doubt that a bargaining representative may not expressly veto a collective bargaining agreement reached between a public school employer and an employee bargaining unit. Nor can the bargaining unit or education association expressly require ratification by the association as a condition of entering into a collective bargaining agreement.

Surrounding that black and white language, however, lies an area of gray that is yet undefined, although probably more important for purposes of resolving specific conflicts that may arise. With only a scant and undeveloped record before the Court, no attempt to determine which interpretation will prevail when § 17 is put into effect should be made. A court should avoid adjudicating the constitutionality of a statute when facts critical to the analysis are yet to be developed. In this case issues remain that can be resolved only when § 17 is applied in practice and a factual record is developed.

Justice MALLETT, joined by Justices CAVANAGH and BOYLE, concurring in part and dissenting in part, stated that § 17 of 1994 PA 112 imposes an unconstitutional burden on the appellants' exercise of their right to freely associate as guaranteed by the First Amendment and Const 1963, art 1, §§ 3 and 5.

Section 17 directly deprives public school employees of the ability to run their organizations as they desire by changing their structure, transposing them from hierarchical to laterally operating entities. This tampering with the affiliation relationship or internal structure is an infringement of the freedom of individuals to choose the kind of organization with which they choose to be affiliated. The right to assist and advise within one's organization is a constitutionally guaranteed right. The state cannot intrude on the rights of groups or the groups' constituent members to delegate authority, select leaders, and receive consultation within the group as they so choose. Through implementation of § 17, the Legislature has conditioned receipt of a protected benefit on an unconstitutional burden of associational freedoms.

The associational freedoms implicated by § 17 invoke the application of greater constitutional protection than that applied in ordinary economic legislation. Because § 17 effectively destroys the rights of the unions to internally govern and the rights of individuals to organize as they desire, and infringes on First Amendment freedom of association rights, it must be examined under strict

scrutiny. The degree to which § 17 infringes on the internal workings of the organizations and individual freedoms in this case is to an extent that is constitutionally intolerable. The state has not demonstrated a compelling interest sufficient to justify this infringement of the freedom of association.

Chief Justice BRICKLEY, joined by Justices RILEY and WEAVER, would hold that § 17 is constitutional. Specifically in § 17, the prohibition against an education association's use of veto power over the ratification of a collective bargaining agreement does not violate the freedom of association rights of local bargaining units, nor should § 17 be construed to prohibit education associations from advising or assisting local bargaining units, even if the education association advises against ratifying a collective bargaining agreement.

Subsection 17(1) of the PERA prohibits education associations from exercising a veto-like power over local bargaining units if that veto prevents the local bargaining units from signing a tentatively approved collective bargaining agreement. Such a power is not guaranteed to an association by the First Amendment. The essential right protected under the freedom of association doctrine is the right to join together in a group of like-minded individuals to exercise free speech. Where a statute regulates the internal organization or affairs of a group, the focus of a freedom of association inquiry should be on the effect the statute has on the decisions of individuals to join that organization to exercise free speech. In this case, § 17 would not sufficiently affect a local bargaining unit's decision to join an education association. Although the increased bargaining strength that results from a compelled unified bargaining stance is attractive to local bargaining units, § 17 only reduces an association's power to compel cohesion and only controls during the collective bargaining process.

Section 17, read as a whole, can be interpreted so as not to prevent education associations from advising and assisting local bargaining units. Such an interpretation is not only constitutionally compelled, but is preferred. Advising a local bargaining unit not to ratify an agreement in no way interferes with its power to ratify or execute a collective bargaining agreement. Because the ability to advise and assist a local unit is not a legal power that associations can enforce against local units, subsection 17(1) does not violate the First Amendment.

Because there is no majority to strike down the constitutionality of § 17, only a majority to vacate the decisions of the trial court and Court of Appeals, § 17 remains a valid and binding statutory provision.

Vacated in part.
212 Mich App 472; 538 NW2d 433 (1995) vacated.

*Sachs, Waldman, O'Hare, Helveston, Bogas &
McIntosh, P.C.* (by *Theodore Sachs, Eileen Nowikow-
ski,* and *Andrew Nickelhoff*), for appellants Michigan
State AFL-CIO.

*Foster, Swift, Collins & Smith, P.C.* (by *Theo-
dore W. Swift, Stephen O. Schultz, Michael J. Bom-
marito,* and *Peter R. Albertins*), for appellants Michi-
gan Education Association.

*Frank J. Kelley,* Attorney General, *Thomas L.
Casey,* Solicitor General, *Christine A. Derdarian* and
*Jon M. DeHorn,* Assistant Attorneys General, for the
defendants.

Amici Curiae:

*Thrun, Maatsch & Nordberg, P.C.* (by *Kevin S.
Harty* and *Cheryl Takacs Bell*), for Michigan Associa-
tion of School Boards.

*Erwin B. Ellmann* and *George E. Bushnell, Jr.,* for
American Civil Liberties Union Fund of Michigan.

BRICKLEY, C.J. In this case plaintiffs question the
constitutionality of several provisions of 1994 PA 112,
which amended the public employment relations act.
The circuit court upheld all but two provisions of the
act. The Court of Appeals affirmed. This Court unani-
mously affirms the Court of Appeals except with
respect to 1994 PA 112, § 17. However, the signers of
this opinion would affirm the judgment of the Court
of Appeals in its entirety and would specifically hold
that § 17's prohibition against an education associa-
tion's use of veto power over the ratification of a col-

lective bargaining agreement does not violate the freedom of association rights of local bargaining units. Accordingly, because there is no majority to strike down the constitutionality of § 17, only a majority to vacate the decisions of the trial court and Court of Appeals, § 17 remains a valid and binding statutory provision.

I

FACTS

On May 2, 1994, the Governor signed into law 1994 PA 112, which significantly departs from previous legislation regulating collective bargaining by public sector employees. For the first time, the Legislature amended the PERA to address collective bargaining, mediation, and strike activities by public school employees in a manner separate from the general body of public employees. Two groups of plaintiffs, one led by Michigan State AFL-CIO and the other by the Michigan Education Association, separately filed complaints, seeking a declaration that the act is unconstitutional. These complaints were later consolidated. After defendants answered, plaintiffs and defendants filed motions and cross-motions for summary disposition.

The circuit court denied plaintiffs' motion except with regard to two provisions of the act. First, it overturned the provision of subsection 2a(4) that fined the collective bargaining representative for strikes by represented public school employees as being violative of due process by imposing liability on a union for the unauthorized actions of individuals. Second, it invalidated the provision of subsection 2a(10) that required the courts to issue a mandatory injunction,

regardless of the equities of the situation, because the provision violated the separation of powers doctrine. Defendants do not appeal these two rulings. On the remaining claims, the circuit court granted defendants' motions for summary disposition. Plaintiffs appealed the ruling, but the Court of Appeals affirmed. 212 Mich App 472; 538 NW2d 433 (1995). We now address plaintiffs' remaining challenges of 1994 PA 112 section by section.

II

SECTION 17

Plaintiffs' central contention on appeal is that § 17 of 1994 PA 112[1] violates public school employees' freedom of association rights.[2] Subsection 17(1) provides that education associations "shall not veto," "shall not require the bargaining unit to obtain . . . ratification," or "shall not in any other way prohibit or prevent the bargaining unit from entering into, ratifying, or executing a collective bargaining agreement."[3] In effect, the subsection prohibits statewide education associations from exercising a veto-

---

[1] MCL 423.217; MSA 17.455(17).

[2] Plaintiffs also argue that § 17's veto prohibition violates their equal protection rights because it only applies to public school employees. We disagree and discuss plaintiffs' equal protection challenge more completely in relation to plaintiffs' challenge to the prohibition against collective bargaining over certain subjects in subsections 15(3) and (4). Our analysis of both equal protection claims is substantially the same. Under our interpretation of § 17, neither a protected class nor a fundamental right is involved. Therefore, we review plaintiffs' claim under the rational basis standard. We conclude that reducing the number of strikes by prohibiting education associations from vetoing the ratification of collective bargaining agreements is a proper public purpose. Concluding that the Legislature had a proper public purpose behind the enactment of § 17, the remaining equal protection analysis parallels our analysis of subsections 15(3) and (4).

[3] The complete text of subsection 17(1) is:

like power over local bargaining units after the local negotiators reach a tentative collective bargaining agreement.[4]

Plaintiffs allege that § 17 violates public school employees' freedom of association rights in two fundamental ways. First, they argue that the right to freedom of association includes a right to combine the ratification power of each local bargaining unit into the statewide education association, and that § 17 violates this right. Second, they argue that § 17 interferes with the right of an education association to advise a local bargaining unit against ratifying an agreement.

A

Plaintiffs assert that the veto power restriction in § 17 violates their right to freedom of association because plaintiffs believe that the power to veto a local bargaining unit's ratification of a collective bargaining agreement allows them to bind together the

---

A bargaining representative or an education association shall not veto a collective bargaining agreement reached between a public school employer and a bargaining unit consisting of employees of the public school employer; shall not require the bargaining unit to obtain the ratification of an education association before or as a condition of entering into a collective bargaining agreement; and shall not in any other way prohibit or prevent the bargaining unit from entering into, ratifying, or executing a collective bargaining agreement. The power to decide whether or not to enter into, ratify, or execute a collective bargaining agreement with a public school employer rests solely with the members of the bargaining unit who are employees of the public school employer, and shall not be delegated to a bargaining representative or an education association or conditioned on approval by a bargaining representative or an education association.

[4] For the first time in the PERA, this subsection requires a particular method of collective bargaining. To be effective, subsection 17(1) requires that the bargaining agent submit tentative agreements to the bargaining unit for ratification. Bargaining agents will no longer be able to ratify a collective bargaining agreement on behalf of the bargaining unit.

ratification power of each local bargaining unit. By vetoing collective bargaining agreements that diverge from the standards established by the education association, the association can compel individual local bargaining units to bargain for the same selected standard provisions in their individual collective bargaining agreements as other units bargain for across the state. As a statewide bargaining group, each local bargaining unit experiences increased strength in its collective bargaining negotiations.

Section 17 limits this power by removing the education association's ability to compel local bargaining unit conformity. Under § 17, education associations can only persuade, not compel, local bargaining units to conform. Therefore, we must decide whether § 17's limitation on education associations' power to compel conformity inside the organization violates First Amendment freedom of association rights. We would hold that, although an association's power to compel conformity among individual groups and, thereby, form a cohesive, larger, group is limited by § 17, the power to compel conformity is not guaranteed by the First Amendment.

The right of freedom of association is a right derived from the freedom of speech. *Roberts v United States Jaycees*, 468 US 609, 622; 104 S Ct 3244; 82 L Ed 2d 462 (1984). "An individual's freedom to speak, to worship, and to petition the government for the redress of grievances could not be vigorously protected from interference by the State unless a correlative freedom to engage in group effort toward those

ends were not also guaranteed."[5] *Id.* Accordingly, if a government regulation impedes an individual's attempt to join an organization, that regulation most likely implicates the individual's freedom of association rights.

In *Roberts*, the United States Supreme Court also recognized that government regulation that interferes with the "internal organization or affairs of the group" may infringe on freedom of association rights. *Id.* at 623. If we were to accept this statement on face value, we would agree with plaintiffs that the restriction imposed by § 17 on education associations' power to compel conformity would interfere with the associations' internal organization and, therefore, would violate freedom of association rights. However, such an interpretation overextends the doctrine, and we do not believe that the statewide organization's power to veto ratification of a collective bargaining agreement is a protected aspect of its internal organization.

The essential right protected under the freedom of association doctrine is the right to join together in a group of like-minded individuals and exercise free speech rights. Therefore, where a statute regulates the internal affairs of an organization, it violates the members' freedom of association if the compelled change in the internal affairs of the organization in turn affects the ability of the organization's members to come together and exercise free speech.

The United States Supreme Court cases that have examined regulations affecting the internal structure

---

[5] Courts recognize another type of freedom of association right protecting against government interference in intimate human relationships. See *Roberts*, 609 US 617-622. That right is not implicated in this case.

of organizations for freedom of association violations
support this interpretation. For example, in *NAACP v
Alabama ex rel Patterson*, 357 US 449, 462-463; 78 S
Ct 1163; 2 L Ed 2d 1488 (1958), the Court struck
down an Alabama order directed at compelling the
NAACP to disclose a list of its members. The order vio-
lated the NAACP's freedom of association because, in
the social climate of the time,

> compelled disclosure of petitioner's Alabama membership is
> likely to affect adversely the ability of petitioner and its
> members to pursue their collective effort to foster beliefs
> which they admittedly have the right to advocate, in that it
> may induce members to withdraw from the Association and
> dissuade others from joining it because of fear of exposure
> of their beliefs shown through their associations and of the
> consequences of this exposure. [*Id.*]

Membership was similarly at issue in *Tashjian v
Republican Party of Connecticut*, 479 US 208; 107 S
Ct 544; 93 L Ed 2d 514 (1986). In that case, the Court
struck down a Connecticut statute that restricted vot-
ing in party primaries to members of the respective
parties. By limiting primary voting to party members,
the statute regulated who the party could include in
its primary voting activity, effectively limiting who
could join together to participate in the group. Recog-
nizing this infringement, the Court noted that, "the
freedom to join together in furtherance of common
political beliefs 'necessarily presupposes the freedom
to identify the people who constitute the associa-
tion.' " *Id.* at 214.

Likewise in *Roberts*, although concluding that a
compelling governmental interest supported the stat-
ute, the Court decided that a Minnesota law requiring
the state Jaycees to admit women implicated freedom

of association. *Roberts*, 468 US 628-629. Again, the freedom of association claim was entangled with the issue of membership. Forcing an organization to admit women directly interfered with the Jaycees' control over their membership. See also *Bd of Directors of Rotary Int'l v Rotary Club of Duarte*, 481 US 537; 107 S Ct 1940; 95 L Ed 2d 474 (1987). Therefore, in cases in which the United States Supreme Court has overturned a regulation because the regulation affected the internal organization of the group, the regulation predominately affected membership or participation in a group.

We recognize that freedom of association rights are not always connected with issues of membership or participation. For example, in *Citizens Against Rent Control v Berkeley, California*, 454 US 290; 102 S Ct 434; 70 L Ed 2d 492 (1981), the United States Supreme Court overturned a statute that imposed limits on organizational spending aimed at supporting or opposing ballot measures without imposing similar limits on individuals. In that case, the Court appeared to focus on an organization's right to "pool money through contributions," not on the right to control membership. *Id.* at 296. Nevertheless, the challenged statute in that case did not regulate the internal affairs of organizations, and we find the case's reasoning less compelling when applied to statutes that do regulate internal affairs than when applied to statutes affecting contributions to political causes. Therefore, where a statute regulates the internal organization or affairs of a group, we would conclude that the focus of a freedom of association inquiry into that statute should be on the effect that the statute has on the

decisions of individuals to join that organization to exercise free speech.

In the present case, we would hold that § 17 does not sufficiently affect a local bargaining unit's decision to join an education association. Although we recognize that the increased bargaining strength that results from a compelled unified bargaining stance is attractive to local bargaining units, § 17 only reduces an association's power to compel cohesion. As we concluded in part II(C) of this opinion, education associations are still free to persuade member local bargaining units to act as a cohesive unit. Further, § 17 only controls education associations during the collective bargaining process; it does not diminish other valuable services education associations may provide their members outside this process. Therefore, without a contrary record before us, we cannot conclude that this diminution in an education association's power will discourage local bargaining unit membership. Accordingly, we reject plaintiffs' freedom of association challenge to § 17's veto power prohibition.

B

Justice Mallett reads the right to freedom of association as prohibiting most regulations that interfere with the internal structure of an organization. In reaching this conclusion, we suggest that he focuses too specifically on individual sentences from various sources.

Justice Mallett argues that "[t]he ability to control the internal structure of one's organization is an essential component of the freedom of association." *Post* at 401. He bases this conclusion on several

authorities. For one, Justice MALLETT cites 4 Rotunda & Nowak, Constitutional Law (2d ed), for the proposition that "[g]enerally, in the context of labor unions, the freedom of association works to advance the collective economic interests of the labor union." *Post* at 400. We find additional detail in additional material from the cited page.

> [I]ndividuals might associate to achieve economic or other goals that are unconnected to any fundamental constitutional right. For example, individuals may join together in labor unions or trade associations. This ability to control one's economic associations is a part of the liberty protected by due process, *but the Court has refused to substitute its judgment for the legislature's as to the legitimate basis for restricting such types of association.* [Rotunda & Nowak, *supra*, § 20.41, p 249 (emphasis added).]

Accordingly, Justice MALLETT's use of this language is out of context. In proper context, it does not support application of the strict scrutiny standard of review to regulations affecting labor unions.

Justice MALLETT also supports his position with significant quotes from *NAACP v Alabama ex rel Patterson*, and *Bd of Directors of Rotary Int'l v Rotary Club of Duarte*. *Post* at 397-399. We prefer to interpret these quotes in the context of the holdings in each opinion. As discussed in part II(A) of this opinion, the holding of each case was based on the consideration of regulations that affected the ability of individuals to become members of associations. Therefore, we do not believe that these quotations support overturning regulations that do not affect the ability to associate.

Justice MALLETT also concludes that "[i]n the context of labor unions, the rights of members to consult, assist, and advise each other necessarily flows into

the power of certain delegated members to preclude activity by the whole organization." *Post* at 403. To support this conclusion, he quotes from *Brotherhood of Railroad Trainmen v Virginia ex rel Virginia State Bar*, 377 US 1; 84 S Ct 1113; 12 L Ed 2d 89 (1964), *post* at 403, and *Smith v Arkansas State Hwy Employees, Local 1315*, 441 US 463; 99 S Ct 1826; 60 L Ed 2d 360 (1979), *post* at 403. However, neither case concerns the attempt of delegated members to preclude activity by organizations or even subgroups of organizations. Therefore, we are cautious about expanding the influence of these individual statements to claims alleging impairment of the ability to veto actions by nonconforming subgroups. Because of our caution, we choose to measure Justice MALLETT's conclusions against the gauge of experience.

Experience teaches that a law does not violate an organization's right of freedom of association just because the law interferes with the internal structure of an organization. In Chapter 423 of the Michigan Compiled Laws alone there are five statutes that arguably would violate Justice MALLETT's holding.[6] Never before has a court suggested that these statutes violate the right of freedom of association. No one has accepted this argument because the right of freedom of association has never before been interpreted as broadly as suggested by Justice MALLETT. Instead, the focus of freedom of association inquiries

---

[6] See MCL 423.9a; MSA 17.454(10) (interfering with unions' internal system for deciding to strike), MCL 423.9e; MSA 17.454(10.4) (regulating the composition of bargaining units), MCL 423.9g; MSA 17.454(10.6) (forcing a union in some situations to attach a copy of the last offer to the strike ballot), MCL 423.214; MSA 17.455(14) (interfering with bargaining groups' internal structure of elections), and MCL 423.251; MSA 17.456(1) (forbidding organizations from hiring strike breakers).

typically rests on statutes that impair the ability of individuals to participate in associations.

C

Regarding plaintiffs' assertion that § 17 interferes with the right of an education association to advise local bargaining units, we choose to interpret the statute to avoid interfering with these rights. Plaintiffs base their argument on the part of subsection 1 that states: education associations "shall not in any other way prohibit or prevent the bargaining unit from entering into, ratifying, or executing a collective bargaining agreement." Read expansively and in isolation from the rest of the statute, this language could be interpreted as prohibiting education associations from counseling a local bargaining unit against entering into a tentative bargaining agreement if such counsel is effective.

Under this interpretation the subsection would undeniably violate First Amendment rights because such a statute prohibits speech by employees of the education association on the basis of its content. *Cohen v California*, 403 US 15; 91 S Ct 1780; 29 L Ed 2d 284 (1971). Although under *Connick v Myers*, 461 US 138; 103 S Ct 1684; 75 L Ed 2d 708 (1983), content-based restrictions on public employee speech may sometimes be upheld,[7] the education association's employees are not public employees. *Connick* simply does not apply.

---

[7] In *Connick*, the United States Supreme Court recognized that the government's interest in promoting the efficiency of public services balances public employees' free speech rights except where employees' speech touches matters of public concern. *Id.* at 142.

As a second constitutional infirmity, plaintiffs allege that § 17 violates public school employees' freedom of association rights. In *Brotherhood of Railroad Trainmen v Virginia ex rel Virginia State Bar*, *supra*, the United States Supreme Court recognized that an association's interest in advising and assisting its members is an interest implicating freedom of association rights. *Id.* at 5-6. On the basis of this right, the Court struck down a Virginia statute aimed at ending a union's practice of both recommending that injured union workers not settle accident claims with their employers without consulting a lawyer and recommending specific lawyers to consult. *Id.* at 4-5. If we were to accept plaintiffs' interpretation of § 17, we would find the same association interest relied on in *Brotherhood of Railroad Trainmen* present in this case.

However, we would conclude that plaintiffs' proposed interpretation of this section is not the preferred interpretation. We note that "[w]henever possible an interpretation that does not create constitutional invalidity is preferred to one that does." *Schwartz v Secretary of State*, 393 Mich 42, 50; 222 NW2d 517 (1974). In this case, only the phrase "shall not in any other way prohibit or prevent" in subsection 17(1) can be interpreted as violating the First Amendment. The remaining text merely restricts the power of education associations to veto local bargaining units' approval of collective bargaining agreements. Therefore, § 17 would be constitutional if we interpreted this section to allow education associations to advise and assist local bargaining units.

We would conclude that such an interpretation is not only constitutionally compelled, but is the pre-

ferred interpretation. In this subsection, the Legislature removes an education association's power over the ratification of a collective bargaining agreement and returns that power to the local bargaining unit. As expressed by the statute: "The power to decide whether or not to enter into, ratify, or execute a collective bargaining agreement with a public school employer rests solely with the members of the bargaining unit . . . ." The act of advising a local bargaining unit not to ratify an agreement in no way interferes with the local unit's "power" to ratify or execute a collective bargaining agreement.

Therefore, in reading the statute as a whole and to conform to constitutional requirements, we would hold that the language of subsection 17(1) that restricts an education association from "in any other way" prohibiting a local bargaining unit from ratifying a collective bargaining agreement only restricts the association from holding a legal "power" over the local unit. The ability to advise and assist a local unit is not a legal power that associations can enforce against local units. Accordingly, under our interpretation of the statute, subsection 17(1) does not violate plaintiffs' First Amendment rights.

### III

#### SUBSECTIONS 15(3) AND (4)

Plaintiffs submit that subsections 15(3) and (4)[8] violate public school employees' First Amendment and equal protection rights. Their argument is based on an overly expansive interpretation of these sections.

---

[8] MCL 423.215(3), (4); MSA 17.455(15)(3), (4).

A

Subsections 15(3) and (4) prohibit collective bargaining over nine subjects. Plaintiffs argue that by denying collective bargaining these subsections actually impinge on public school employees' freedom of speech. If these subsections denied public school employees the right to voice their concerns over these nine subjects, they would violate the First Amendment. *City of Madison v Wisconsin Employment Relations Comm*, 429 US 167; 97 S Ct 421; 50 L Ed 2d 376 (1976). However, nothing in the subsections prohibits discussion.

Instead, they prohibit public school employers from collectively bargaining over these subjects with their employees. Collective bargaining as a process requires both parties to confer in good faith—to listen to each other. MCL 423.215(1); MSA 17.455(15)(1). The First Amendment does not. *Smith v Arkansas State Hwy Employees, supra* at 465. In these subsections, the Legislature simply has removed the statutory requirement that public school employers listen to their employees and instructed the employers not to collectively bargain with regard to these subjects. In effect, the Legislature simply classified the disputed subjects as illegal subjects of collective bargaining.[9] That classification does not implicate First Amendment rights.

---

[9] An "illegal" subject of bargaining is a provision, such as a closed shop, that is unlawful under the collective bargaining statute or other applicable statute. "The parties are not explicitly forbidden from discussing matters which are illegal subjects of bargaining, but a contract provision embodying an illegal subject is . . . unenforceable." [*Detroit Police Officers Ass'n v Detroit*, 391 Mich 44, 54-55, n 6; 214 NW2d 803 (1974) (citation omitted).]

B

Plaintiffs also argue that subsections 15(3) and (4) violate public school employees' equal protection rights because they only prohibit public school employees, not all public employees, from collectively bargaining over the enumerated subjects. To decide this claim, we recognize that public school employees are not a protected class. We also recognize that this challenge does not implicate any fundamental rights. Plaintiffs allege that these subsections violate their First Amendment rights, but, as previously discussed, we disagree.

Therefore, we will review their claim under the rational basis standard of review. We uphold a statute under that standard if it furthers a legitimate government interest and if the challenged classification is rationally related to achieving the interest. *Shavers v Attorney General*, 402 Mich 554, 618; 267 NW2d 72 (1978).

One of the government interests advanced by the act as a whole is the reduction of strikes by public school employees and of the resultant interruption of public education. *Gaidamavice v Newaygo Bd of Co Rd Comm'rs*, 341 Mich 280, 285; 67 NW2d 178 (1954). Subsections 15(3) and (4) reflect the Legislature's judgment that removing certain topics from collective bargaining will promote this interest. In practice, subsections 15(3) and (4) may or may not achieve the desired result. However, it is reasonable for the Legislature to assume that this limitation on collective bargaining will reduce the number of public school employee strikes. Accordingly, we will not disturb its

judgment,[10] and we accept the proposed purpose of these sections as a legitimate government interest.

We also agree that the classifications are rationally related to the purpose of reducing strikes by public school employees. Public Act 112 creates the classifications of public employees employed by the public school and public employees otherwise employed. These classifications are appropriate because of the existing record of public employee strikes. As reflected in the affidavit of Shlomo Sperka, Director of the Michigan Department of Labor, Bureau of Employment Relations, the overwhelming majority of public employee work stoppages in this state between fiscal years 1988-89 and 1993-94 involved public school employees. In light of this history, the Legislature rationally could have decided that the relationship between public school employees and employers required unique treatment to reduce work stoppages. Therefore, subsections 15(3) and (4) survive plaintiffs' equal protection challenge.

IV

SUBSECTIONS 1(1)(i) AND 6(1)

Plaintiffs allege that the prohibition against unfair labor practice strikes in subsection 1(1)(i)[11] and sub-

---

[10] We reiterate our statement in *Shavers*:

"We are not concerned . . . with the wisdom, need, or appropriateness of the legislation." Legislative bodies have broad scope to experiment with economic problems, and this Court does not sit to "subject the State to an intolerable supervision hostile to the basic principles of our Government and wholly beyond the protection which the general clause of the Fourteenth Amendment was intended to secure." [*Id.* at 614, n 38, quoting *Ferguson v Skrupa*, 372 US 726, 730; 83 S Ct 1028; 10 L Ed 2d 93 (1963).]

[11] MCL 423.201(1)(i); MSA 17.455(1)(1)(i).

section 6(1)[12] violate their free speech rights. Because both subsections are operationally similar, we will limit our discussion to subsection 1(1)(i), understanding that our conclusions concerning that subsection apply to both. Subsection 1(1)(i) provides:

> "Strike" means the concerted failure to report for duty, the willful absence from one's position, the stoppage of work, or the abstinence in whole or in part from the full, faithful, and proper performance of the duties of employment for the purpose of inducing, influencing, or coercing a change in employment conditions, compensation, or the rights, privileges, or obligations of employment. For employees of a public school employer, strike also includes an action described in this subdivision that is taken for the purpose of protesting or responding to an act alleged or determined to be an unfair labor practice committed by the public school employer.

Therefore, a strike is defined in relation to the motivation for the work stoppage. As applied to public school employees, the list of prohibited motivations includes protesting unfair labor practices. Plaintiffs argue that by prohibiting strikes motivated by unfair labor practices this subsection effectively prohibits speech on the basis of its content.

If the Legislature prohibited picketing on the basis of the motivation for the picketing, we would agree that such a regulation violated free speech rights. *Chicago Police Dep't v Mosley*, 408 US 92; 92 S Ct 2286; 33 L Ed 2d 212 (1972). However, the conduct at issue in subsections 1(1)(i) and 6(1) is the act of striking, not the act of picketing. Withholding services

---

[12] MCL 423.206(1); MSA 17.455(6)(1).

alone does not communicate a sufficiently distinctive message. Striking is more action than speech.

Therefore, we conclude that the act of striking is not sufficiently communicative to enjoy First Amendment protection. *United States v O'Brien*, 391 US 367, 376; 88 S Ct 1673; 20 L Ed 2d 672 (1968). Accordingly, the Legislature may regulate that conduct without violating free speech guarantees. Therefore, the prohibition of strike activity on the basis of the motivation for the strike does not violate the First Amendment, regardless of the type of motivation the Legislature singles out.[13]

V

SUBSECTION 1(2)

Plaintiff AFL-CIO argues that subsection 1(2)[14] violates public school employees' First Amendment free speech rights. Currently, that subsection provides:

> This act does not limit, impair, or affect the right of a public employee to the expression or communication of a view, grievance, complaint, or opinion on any matter related to the conditions or compensation of public employment or their betterment as long as the expression or communication does not interfere with the full, faithful, and proper performance of the duties of employment.

---

[13] Plaintiffs also express concern that the amendments of subsections 1(1)(i) and 6(1) interfere with the rights articulated in *Rockwell v Crestwood School Dist Bd of Ed*, 393 Mich 616; 227 NW2d 736 (1975). *Rockwell* held that the MERC may reinstate teachers who were engaged in an unfair labor practice strike if reinstatement best effectuated the policies of the PERA. *Id.* at 641. However, this Court decided *Rockwell* on the basis of a separate section of the PERA not amended by 1994 PA 112. See MCL 423.216(b); MSA 17.455(16)(b). Accordingly, we conclude that *Rockwell* is unaltered by Act 112.

[14] MCL 423.201(2); MSA 17.455(1)(2).

Before enactment of Act 112, the PERA contained similar language, appended to the act's definition of "strike." This language spoke in terms of expression or communication not designed to interfere with employment. Specifically, the former text read:

> This act shall not be construed to limit, impair, or affect the right of a public employee to the expression or communication of a view, grievance, complaint, or opinion on any matter related to the conditions or compensation of public employment or their betterment, so long as the same *is not designed to* and does not interfere with the full, faithful, and proper performance of the duties of employment. [MCL 423.201(a); MSA 17.455(1)(a) (emphasis added).]

Therefore, the original text took the intent of the speaker into consideration.

Plaintiffs argue that Act 112 removed the intent element from this subsection and that the subsection now punishes speech that has the unintended effect of interfering with the "performance of the duties of employment." Plaintiffs misread this subsection. Subsection 1(2) does not punish any conduct. It only instructs courts respecting their efforts to interpret the PERA. Because subsection 1(2) is instructional in nature, it cannot violate free speech rights by itself.

Additionally, this subsection voluntarily limits the PERA's impairment of employee expression or communication. It is a shield that protects public employees from impairment of expression, not a sword that prohibits expression. As such, even if this shield of protection were not as extensive as the shield of protection guaranteed under the First Amendment, the First Amendment would protect employee speech where this section does not. The Legislature could rewrite the subsection to provide less protection than the

First Amendment, and it would still not violate the First Amendment. The revision simply would render the subsection inconsequential. Therefore, subsection 1(2) does not violate the First Amendment.

VI

SUBSECTIONS 2a AND 6(1)

Finally, plaintiffs argue that the conflicting definitions of "strike" in subsections 2a[15] and 6(1) fail to provide adequate notice of what conduct violates the act and that, therefore, these subsections violate due process. However, we conclude that the definition of the term "strike" is consistent as between these two subsections.

Subsection 2a(1) fines public school employees for engaging in strikes. It provides:

> If a public school employer alleges that there is a strike by *1 or more public school employees* in violation of section 2, the public school employer shall notify the commission of the full or partial days a public school employee was engaged in the alleged strike. [Emphasis added.]

Subsection 6(1) restates the definition of "strike" from subsection 1(1)(i) that applies to the remainder of the act:

> Notwithstanding the provisions of any other law, a public employee who, by concerted action with others and without the lawful approval of his or her superior, willfully absents himself or herself from his or her position, or abstains in whole or in part from the full, faithful and proper performance of his or her duties for the purpose of inducing, influencing or coercing a change in employment conditions, compensation, or the rights, privileges, or obligations of

---

[15] MCL 423.202a; MSA 17.455(2a).

employment, or a public employee employed by a public school employer who engages in an action described in this subsection for the purpose of protesting or responding to an act alleged or determined to be an unfair labor practice committed by the public school employer, shall be considered to be on strike. [MCL 423.206(1); MSA 17.455(6)(1).]

Plaintiffs argue that the subsections are inconsistent because subsection 2a(1) only requires a strike by one employee, but subsection 6(1) requires "concerted action with others." Although subsection 6(1) requires concerted action, the concerted action can be an action other than abstaining from work, such as providing financial support. Under subsection 6(1), a "strike" also obtains if a group of employees aids one employee's effort to engage in a work stoppage: the one employee abstaining from work is on strike; the other employees are not on strike, but are engaging in concerted action with the striking employee. Therefore, the reference to "a strike by 1 or more public school employees" in subsection 2a(1) does not conflict with the definition of strike in subsection 6(1) because subsection 6(1) recognizes strikes in which only one employee abstains from work. Accordingly, one definition does not render the other unconstitutionally vague.

CONCLUSION

This Court unanimously upholds the Court of Appeals except with respect to 1994 PA 112, § 17. When properly interpreted, the signers of this opinion do not believe that any of the facially challenged provisions before us violate constitutional rights. We reach this conclusion understanding that § 17 shall not be construed to prohibit education associations from advising or assisting local bargaining units, even

if the education association advises against ratifying a collective bargaining agreement. Accepting this interpretation, we would affirm the decision of the Court of Appeals in its entirety. Consequently, because a majority has not overturned § 17, it remains a valid and binding statutory provision.

RILEY and WEAVER, JJ., concurred with BRICKLEY, C.J.

LEVIN, J. (*separate opinion*). The opinions of my colleagues are in agreement on all but the challenge to § 17 of 1994 PA 112.[1] I join with the three signers

---

[1]　(1) A bargaining representative or an education association shall not veto a collective bargaining agreement reached between a public school employer and a bargaining unit consisting of employees of the public school employer; shall not require the bargaining unit to obtain the ratification of an education association before or as a condition of entering into a collective bargaining agreement; and shall not in any other way prohibit or prevent the bargaining unit from entering into, ratifying, or executing a collective bargaining agreement. The power to decide whether or not to enter into, ratify, or execute a collective bargaining agreement with a public school employer rests solely with the members of the bargaining unit who are employees of the public school employer, and shall not be delegated to a bargaining representative or an education association or conditioned on approval by a bargaining representative or an education association.

(2) If an education association, a bargaining representative, or a bargaining unit violates this section, the board of a public school employer or any other person adversely affected by the violation of this section may bring an action to enjoin the violation of this section in the circuit court for the county in which the plaintiff resides or the circuit court for the county in which the affected public school employer is located. Failure to comply with an order of the court may be punished as contempt. In addition, the court shall award court costs and reasonable attorney fees to a plaintiff who prevails in an action brought under this section.

(3) As used in this section, "education association" means an organization, whether organized on a county, regional, area, or state basis, in which employees of 1 or more public school employers participate and that exists for the common purpose of protecting and advancing the wages, hours, and working conditions of the organization's members. [MCL 423.217; MSA 17.455(17).]

of the opinion (that finds that § 17 imposes an unconstitutional infringement on the freedom of association guaranteed by the First Amendment) in vacating the decision of the Court of Appeals[2] insofar as it held § 17 to be constitutional. But I do not do so on the ground that § 17 is unconstitutional, but on other grounds.

I join in vacating the decision of the Court of Appeals for reasons stated by the United States Supreme Court, which, on more than one occasion, has "cautioned against declaratory judgments on issues of public moment, even falling short of constitutionality, in speculative situations." *Public Affairs Associates, Inc v Rickover*, 369 US 111, 112; 82 S Ct 580; 7 L Ed 2d 604 (1962); *Eccles v Peoples Bank*, 333 US 426, 432; 68 S Ct 641; 92 L Ed 784 (1948).

Here, a factual record is nonexistent, and is thus even more "fragile" than the record described in *Rickover, supra* at 112-113,[3] where the United States

---

[2] *Michigan State AFL-CIO v Michigan Employment Relations Comm*, 212 Mich App 472; 538 NW2d 433 (1995).

[3] The Court described the record in the following paragraphs:

In these cases, we are asked to determine matters of serious public concern. They relate to claims to intellectual property arising out of public employment. They thus raise questions touching the responsibilities and immunities of those engaged in the public service, particularly high officers, and the rightful demands of the Government and the public upon those serving it. These are delicate problems; their solution is bound to have far-reaching import. Adjudication of such problems, certainly by way of resort to a discretionary declaratory judgment, should rest on an adequate and full-bodied record. The record before us is woefully lacking in these requirements.

The decisions of the courts below rested on an Agreed Statement of Facts which sketchily summarized the circumstances of the preparation and of the delivery of the speeches in controversy in relation to the Vice Admiral's official duties. The nature and scope of his duties were not clearly defined and less than an adequate

Supreme Court vacated the decision of the United
States Court of Appeals for the District of Columbia
Circuit,[4] which had addressed the merits, and where
the United States Supreme Court said:

> So fragile a record is an unsatisfactory basis on which to
> entertain this action for declaratory relief. [369 US 114.]

I

The Michigan Education Association and the Michi-
gan State AFL-CIO assert that § 17 unconstitutionally
interferes with their members' right to associate
freely as guaranteed to them under the Michigan and
United States Constitutions. As set forth in plaintiff
AFL-CIO's complaint, plaintiffs allege that § 17

> unconstitutionally interfere[s] and intrude[s] upon the inter-
> nal arrangements and organizational relations between affil-
> iated employee organizations in a number of respects, and
> additionally impair[s] the constitutions, by-laws, and gov-

---

exposition of the use by him of government facilities and govern-
ment personnel in the preparation of these speeches was given.
Administrative practice, insofar as it may relevantly shed light, was
not explored. The Agreed Statement of Facts was in part phrased,
modified and interpreted in the course of a running exchange
between trial judge and counsel. The extent of the agreement of
counsel to the Agreed Statement of Facts was in part explained in
the course of oral argument in the District Court. None of the
undetailed and loose, if not ambiguous, statements in the Agreed
Statement of Facts was subject to the safeguards of critical probing
through examination and cross-examination. This is all the more
disturbing where vital public interests are implicated in a requested
declaration and the Government asserted no claim (indeed
obliquely may be deemed not to have disapproved of the defend-
ant's claim) although the Government was invited to appear in the
litigation as amicus curiae and chose not to do so. So fragile a
record is an unsatisfactory basis on which to entertain this action
for declaratory relief.

[4] 109 US App DC 128; 284 F2d 262 (1960).

erning instruments of such organizations, thereby prohibit-
ing, burdening, and chilling public school employees in the
exercise of their right to freely associate with others for the
common orderly advancement of their beliefs, ideas and
interests. . . .[5]

The Governor and the MERC, represented by the
Attorney General, assert that § 17 has a narrower
effect, and does not implicate constitutionally pro-
tected associational freedoms. At oral argument, the
Assistant Attorney General said that "[t]he collective
bargaining process remains untouched with [the
exception of] only one aspect, and that is the final
decision on the signing of the contract."

Although my colleagues who would affirm the
Court of Appeals declaration of constitutionality
adopt a narrow construction of § 17, one which per-
haps would not impermissibly trample upon the asso-
ciational rights of union members, one cannot be con-
fident, based on the record so far developed, that
such a construction is either correct or may dependa-
bly be relied on.

Some of the language of § 17 seems, at least ini-
tially, to be clear on its face. There can be little doubt
that a bargaining representative may not expressly
"veto" a collective bargaining agreement reached
between a public school employer and an employee
bargaining unit. Nor can the bargaining unit or educa-
tion association expressly require ratification by the
association "as a condition of entering into a collec-
tive bargaining agreement."

---

[5] Plaintiff MEA alleged in its complaint that "[t]he thrust of subsection
17(1) of [1994] PA 112 is to quash free collective speech and efforts to
resolve impasses by eliminating bargaining representatives."

Surrounding that black and white language, however, lies an area of gray that is yet undefined, although probably more important for purposes of resolving specific conflicts that may arise. Following the seemingly clear provisions, is more general language that "[a] bargaining representative or educational association . . . shall not in any other way prohibit or prevent the bargaining unit from entering into, ratifying, or executing a collective bargaining agreement." Much of oral argument in this Court was spent in an effort to uncover, without much success, the true meaning of the statute in general and § 17 in particular and the effect it would have once implemented.[6]

The justices who write for constitutionality, would hold that:

- ". . . [t]he act of advising a local bargaining unit not to ratify an agreement in no way interferes with the local unit's 'power' to ratify or execute a collective bargaining agreement;

- ". . . reading the statute as a whole and to conform to constitutional requirements, . . . the language of subsection 17(1) that restricts an education association from 'in any other way' prohibiting a local bargaining unit from ratifying a collective bargaining agreement only restricts the association from holding a legal 'power' over the local unit."[7]

---

[6] The Assistant Attorney General said that "[t]he Act hasn't finished playing out yet."

[7] *Ante,* p 379.

Nevertheless, as demonstrated by the divergent hypotheses regarding what § 17 does, and what effect it will ultimately have, set forth in the complaints, briefs and at oral argument, there is a range of different meanings that one could attribute to the section. With only a scant and undeveloped record before us, we should not attempt to determine which interpretation will prevail, when § 17 is put into effect, for the answer may then become apparent.

In practice, it is possible that § 17 will no more infringe on employee associational rights than other legislation that regulated union structure and conduct to promote valid state interests.[8] But it is also possible that an effort may be made to enforce § 17 in a manner feared by the unions, chilling the right of association and undermining the hierarchical structure that the unions claim is essential to their function.[9] One cannot say with assurance how the state may seek to enforce § 17.

II

The record in the instant cases consists of the complaints and the defendants' responses, motions, briefs and arguments at the trial and appellate levels. There is no factual record, depositions or stipulations regarding the facts.

The United States Court of Appeals for the First Circuit recently observed that "the discretion to grant declaratory relief is to be exercised with great cir-

---

[8] *Babbit v United Farm Workers Nat'l Union,* 442 US 289; 99 S Ct 2301; 60 L Ed 2d 895 (1979); *Smith v Arkansas State Hwy Employees, Local 1315,* 441 US 463; 99 S Ct 1826; 60 L Ed 2d 360 (1979).

[9] Cf. *Brotherhood of Railroad Trainmen v Virginia ex rel Virginia State Bar,* 377 US 1, 5-6; 84 S Ct 1113; 12 L Ed 2d 89 (1964); *Brown v Alexander,* 718 F2d 1417, 1421-1423 (CA 6, 1983).

cumspection when matters of public moment are involved, or when a request for relief threatens to drag a federal court prematurely into constitutional issues that are freighted with uncertainty." *Ernst & Young v Depositors Economic Protection Corp*, 45 F3d 530, 535 (CA 1, 1995).

A court should avoid adjudicating the constitutionality of a statute when facts critical to the analysis are yet to be developed. "A constitutional challenge must present 'a real and substantial controversy admitting of specific relief through a decree of conclusive character, as distinguished from an opinion advising what the law would be upon a hypothetical state of facts.' " *United States v Instruments SA, Inc*, 807 F Supp 811, 815 (D DC, 1992) (quoting, *Aetna Life Ins v Haworth*, 300 US 227, 241; 57 S Ct 461; 81 L Ed 617 [1937]); 26 CJS, Declaratory Judgment, § 44.

This Court should pass on the constitutionality of a statute in a declaratory judgment action only as a "last resort," and should refrain from "anticipat[ing]" the question which would ultimately be raised once the statute is applied. *Ashwander v Tennessee Valley Authority*, 297 US 288, 345-348; 56 S Ct 466; 80 L Ed 688 (1936) (Brandeis, J., concurring).

In this case issues remain that can be resolved only when § 17 is applied in practice and a factual record is developed.

I join in vacating the decision of the Court of Appeals and the circuit court insofar as they held § 17 to be constitutional.

MALLETT, J. (*concurring in part*). For the most part, I agree with Chief Justice BRICKLEY with respect to the constitutionality of 1994 PA 112. However, I disagree

with his analysis of § 17. Therefore, I write separately to explain why I disagree with parts II(A), (B), and (C) of his opinion. I find that § 17 of 1994 PA 112 imposes an unconstitutional burden on the appellants' exercise of their right to freely associate as guaranteed by the First Amendment. Therefore, I respectfully dissent.

I

SECTION 17 OF 1994 PA 112 ABRIDGES APPELLANTS'
FREEDOM OF ASSOCIATION RIGHTS

Subsection 17(1) provides:

> *A bargaining representative or an education association shall not veto* a collective bargaining agreement reached between a public school employer and a bargaining unit consisting of employees of the public school employer; *shall not require the bargaining unit to obtain the ratification* of an education association before or as a condition of entering into a collective bargaining agreement; *and shall not in any other way prohibit or prevent* the bargaining unit from entering into, ratifying, or executing a collective bargaining agreement. The power to decide whether or not to enter into, ratify, or execute a collective bargaining agreement with a public school employer rests solely with the members of the bargaining unit who are employees of the public school employer, and shall not be delegated to a bargaining representative or an education association or conditioned on approval by a bargaining representative or an education association. [Emphasis added.]

Chief Justice BRICKLEY interprets this subsection as regulating the relationship between the local bargaining units and the education associations by "prohibit[ing] statewide education associations from exercising a veto-like power over local bargaining units after the local negotiators reach a tentative collective

bargaining agreement." *Ante* at 368-369. Further, in an attempt to lessen the blow of the act, he interprets § 17 as allowing the education associations the power to "persuade," "assist," and "advise," see *ante* at 374 and 378, the bargaining units during the collective bargaining process. I disagree with that interpretation. The language of § 17 extends beyond merely touching associational freedoms and reaches farther into the intricate structure of the unions than suggested by the Chief Justice. I believe that the language of § 17 reaches the point of interfering with constitutional rights derived from the First Amendment.

Simply put, the issue presented is whether 1994 PA 112, § 17, infringes on rights guaranteed by the First Amendment of the federal constitution and the equivalent provisions of the Michigan Constitution.[1] I believe that it does.

---

[1] Const 1963, art 1, § 5 reads as follows:

Every person may freely speak, write, express and publish his views on all subjects, being responsible for the abuse of such right; and no law shall be enacted to restrain or abridge the liberty of speech or of the press.

Const 1963, art 1, § 3 reads as follows:

The people have the right peaceably to assemble, to consult for the common good, to instruct their representatives and to petition the government for redress of grievances.

The First Amendment to the United States Constitution states:

Congress shall make no law respecting an establishment of religion, or prohibiting the free exercise thereof; or abridging the freedom of speech, or of the press; or the right of the people peaceably to assemble, and to petition the Government for a redress of grievances.

A. THE FREEDOM TO ASSOCIATE[2]

First Amendment rights protected by the federal constitution are applicable to the states through the Due Process Clause of the Fourteenth Amendment. There exists no expressly articulated right of freedom of association. Rather, as stated by Chief Justice BRICKLEY, "[t]he right of freedom of association is a right derived from the freedom of speech." *Ante* at 370.[3] This right of association was set forth by the United States Supreme Court in *NAACP v Alabama ex rel Patterson*, 357 US 449, 460-461; 78 S Ct 1163; 2 L Ed 2d 1488 (1958).[4] The Court stated:

> Effective advocacy of both public and private points of view, particularly controversial ones, is undeniably enhanced by group association, as this Court has more than once recognized by remarking upon the close nexus between the freedoms of speech and assembly. . . . It is beyond debate that freedom to engage in association for the advancement of beliefs and ideas is an inseparable aspect of the "liberty" assured by the Due Process Clause of the Fourteenth Amendment, which embraces freedom of

---

[2] Michigan case law on the subject of the freedom of association is quite sparse. The birth and growth of First Amendment associational freedoms have developed through the jurisprudence of the United States Supreme Court and its interpretation of the federal constitution. I will, therefore, rely on the United States Supreme Court's interpretation of the federal constitution in this area of First Amendment jurisprudence.

[3] Among the rights protected by the First Amendment is the right of individuals to associate to further their personal beliefs. While the freedom of association is not explicitly set out in the Amendment, it has long been held to be implicit in the freedoms of speech, assembly, and petition. [*Healy v James*, 408 US 169, 181; 92 S Ct 2338; 33 L Ed 2d 266 (1972).]

[4] In *NAACP v Alabama*, the NAACP challenged a state court order to produce many records, including its membership lists. The NAACP refused to produce its membership lists and was fined. The United States Supreme Court held that the NAACP was entitled under the federal constitution to refuse to disclose its membership lists.

speech. . . . Of course, *it is immaterial whether the beliefs
sought to be advanced by association pertain to political,
economic, religious or cultural matters, and state action
which may have the effect of curtailing the freedom to
associate is subject to the closest scrutiny.* [Emphasis
added.]

In *Roberts v United States Jaycees,* 468 US 609,
618; 104 S Ct 3244; 82 L Ed 2d 462 (1984), the United
States Supreme Court stated that "the nature and
degree of constitutional protection afforded freedom
of association may vary depending on the extent to
which one or the other aspect of the constitutionally
protected liberty is at stake in a given case." There
are no limits or set parameters on potential associa-
tional freedoms. Further, there exists no bright-line
test for determining the appropriate measure of con-
stitutional protection against state interference with
associational rights. Accordingly, the nature and
extent to which the state may interfere with the free-
dom of association is dependent upon the type of
associational rights implicated in each particular case.

Chief Justice BRICKLEY states that "[t]he essential
right protected under the freedom of association doc-
trine is the right to join together in a group of like-
minded individuals and exercise free speech rights."
*Ante* at 371. However accurate this statement may be,
I prefer to rely on a broader statement describing the
freedom of association. The United States Supreme
Court has stated:

[T]he right to engage in activities protected by the First
Amendment "implies a corresponding right to associate
with others in pursuit of a *wide variety* of political, social,
economic, educational, religious, and cultural ends." [*Bd of
Directors of Rotary Int'l v Rotary Club of Duarte,* 481 US

537, 548; 107 S Ct 1940; 95 L Ed 2d 474 (1987) (emphasis
added).]

Thus, I believe that associational rights afforded by
the First Amendment are broader than recognized by
Chief Justice BRICKLEY.

Additionally, Chief Justice BRICKLEY narrows the
possibilities for state infringement on the freedom of
association. In determining whether association rights
are implicated, he focuses primarily on whether an
individual's attempt to *join* an organization is
impeded by state interference. See *ante* at 371. Chief
Justice BRICKLEY's "attempt to join" test is overly
restrictive of the implication of associational rights. I
believe that implication of First Amendment freedom
of association rights may occur through many possi-
ble means and would not focus solely on whether an
individual is impeded from joining an organization
before feeling justified to invoke constitutional pro-
tections. Specifically, once an individual decides to
join a group or organization, the associational free-
doms that existed when the individual made the deci-
sion and joined the group remain intact and even
become strengthened. Therefore, any governmental
intrusion on the internal structure and organization of
a group may pose questions of constitutional signifi-
cance. See *Roberts*, 468 US 623 (government infringe-
ment on the freedom of association may result from
"interfer[ing] with the internal organization or affairs
of the group").[5]

---

[5] See Tribe, Constitutional Law (2d ed), § 12-26, p 1015. Tribe identifies
four specific instances in which legislation may infringe on freedom of
association rights. He states:

It is well understood that employee unions enjoy freedom of association rights. Generally, in the context of labor unions, the freedom of association works to advance the collective economic interests of the labor union. See 4 Rotunda & Nowak, Constitutional Law (2d ed), § 20.41, p 249. The United States Court of Appeals for the Sixth Circuit in *Brown v Alexander*, 718 F2d 1417, 1422 (CA 6, 1983), stated "that first amendment protections extend to labor union activities and the right of employees to associate together as a labor organization." Further, it is undisputed that public employee unions also enjoy freedom of association rights.[6] However, the First

---

Government can abridge this implied first amendment freedom, and therefore be guilty of violating due process unless a showing of compelling necessity is made, in any of four ways: (1) directly punishing the fact of membership in a group or association or the fact of attendance at a meeting of such a group or association; (2) intruding upon the internal organization, or integral activities, of an association or group, including its decisions of whom to include as members and its decisions as to which non-members to invite to take part in its processes; (3) withholding a privilege or benefit from the members of a group or association; and (4) compelling disclosure of a group's membership or of an individual's associational affiliations, either through a focused investigation or as part of a general disclosure rule, in circumstances where anonymity is likely to prove important to the continued viability of various associational ties.

Thus, by simply focusing on whether a piece of legislation has the effect of discouraging an individual from joining an organization, Chief Justice BRICKLEY ignores these additional means by which the freedom of association may be implicated.

[6] In *Brotherhood of Railroad Trainmen v Virginia ex rel Virginia State Bar*, 377 US 1, 5-6; 84 S Ct 1113; 12 L Ed 2d 89 (1964), the Supreme Court stated:

It cannot be seriously doubted that the First Amendment's guarantees of free speech, petition and assembly give railroad workers the right to gather together for the lawful purpose of helping and advising one another in asserting the rights Congress gave them in the Safety Appliance Act and the Federal Employers' Liability Act,

Amendment does not guarantee public employee unions collective bargaining rights or even recognition. *Id.* at 1421.[7] Thus, I am fully aware that public employee collective bargaining rights are statutorily created and are not part of the First Amendment package of fundamental rights. However, I believe that § 17 goes well beyond aiming at statutorily created collective bargaining rights and targets First Amendment associational freedoms.

I believe that § 17 of 1994 PA 112 directly deprives the public school employees of the ability to run their organizations as they desire.[8] The ability to control the internal structure of one's organization is an essential component of the freedom of association.

As in the case of most unions, the AFL-CIO and the MEA are hierarchical structures. When the individual bargaining unit members choose to associate with the statewide or the larger association, these people willingly relinquish the right to assert, in isolation and

statutory rights which would be vain and futile if the workers could not talk together freely as to the best course to follow.

[7] The public employee surely can associate and speak freely and petition openly, and he is protected by the First Amendment from retaliation for doing so. . . . But the First Amendment does not impose any affirmative obligation on the government to listen, to respond or, in this context, to recognize the association and bargain with it. [*Smith v Arkansas State Hwy Employees, Local 1315,* 441 US 463, 465; 99 S Ct 1826; 60 L Ed 2d 360 (1979).]

[8] Chief Justice BRICKLEY states that § 17 "does not diminish other valuable services education associations may provide their members outside [the collective bargaining] process." *Ante* at 374. I disagree. The effect of § 17 over the course of time will render the processes of assisting, advising, and providing valuable services meaningless. Section 17 apparently still permits consultation, but delegates the decision to seek out consultation to the local unions. This is inconsistent with the purpose of joining a statewide organization where behavioral norms are established that must be adhered to by everyone to maximize the collective benefits.

absent a statewide context, what is best for the individual bargaining unit. The individual bargaining unit members realize that they will benefit from the association's overall pattern of collective action. The United States Supreme Court expressly articulated the importance of the affiliation relationship to the effectiveness of the labor union.

> The essence of the affiliation relationship is the notion that the parent will bring to bear its often considerable economic, political, and informational resources when the local is in need of them.
>
> *      *      *
>
> "[I]f a union is to perform its statutory functions, it must maintain its corporate or associational existence, must elect officers to manage and carry on its affairs, and may consult its members about overall bargaining goals and policy." . . . We see no reason why analogous public-sector union activities should be treated differently. [*Lehnert v Ferris Faculty Ass'n*, 500 US 507, 523; 111 S Ct 1950; 114 L Ed 2d 572 (1991) (citations omitted).]

Likewise, the United States Court of Appeals for the Sixth Circuit has stated:

> An "affiliate" in an organization is defined for some purposes as an associate. To be affiliated with a group or organization is to be associated with, attached to, or identified with that organization. We believe this subsection [of the challenged act] directly limits freedom of association between labor organizations, *and their members or members of other such organizations,* and thus it could restrain or restrict freedom of association, a fundamental first amendment right. [*Brown v Alexander*, 718 F2d 1425 (emphasis added).]

Section 17 of Act 112 changes the very structure of the labor organizations. It transposes them from hier-

archical to laterally operating entities. Thus, I would hold that tampering by the state with the affiliation relationship or internal structure is an infringement on the freedom of individuals to choose the kind of organization with which they choose to be affiliated.

Moreover, the United States Supreme Court has recognized the importance of expert advice and consultation to the effectiveness of labor unions.

> The right of members to consult with each other in a fraternal organization necessarily includes the right to select a spokesman from their number who could be expected to give the wisest counsel. [*Brotherhood of Railroad Trainmen v Virginia ex rel Virginia State Bar*, 377 US 1, 6; 84 S Ct 1113; 12 L Ed 2d 89 (1964).]

Further, the Court has stated:

> The First Amendment protects the right of an individual to speak freely, to advocate ideas, to associate with others, and to petition his government for redress of grievances. *And it protects the right of associations to engage in advocacy on behalf of their members. [Smith v Arkansas State Hwy Employees, Local 1315*, 441 US 463, 464; 99 S Ct 1826; 60 L Ed 2d 360 (1979) (emphasis added; citations omitted).]

The right to assist and advise within one's organization is a constitutionally guaranteed right. See *Brotherhood of Railroad Trainmen*, 377 US 6. In the context of labor unions, the rights of members to consult, assist, and advise each other necessarily flows into the power of certain delegated members to preclude activity by the whole organization. The state cannot intrude on the rights of groups or the groups' constituent members to delegate authority, select leaders,

and receive consultation within the group as they so choose.[9]

Under the language of § 17, the hierarchical structure, affiliation system, and internal agreements inherent in the labor organizations involved here are made illegal and subject the organizations to penalties. Section 17 precludes the entities and constituent members from defining their relationship and operating under their chosen parameters.[10]

In his treatise on Constitutional Law, Tribe discusses four ways that associational freedoms are implicated.[11] As discussed, § 17 intrudes on the internal organization of the associations. Further, § 17 conditions the privileges or benefits of collective bargaining on whether the organization has designated an exclusive bargaining representative. Section 17, in effect, states that an individual may not belong to an organization that requires the designation of an exclusive bargaining agent. If a bargaining unit enters into membership of a larger organization that requires, as

---

[9] Further, in *Brotherhood of Railroad Trainmen*, the United States Supreme Court stated:

> Laymen cannot be expected to know how to protect their rights when dealing with practiced and carefully counseled adversaries . . . and for them to associate together to help one another to preserve and enforce rights granted them under federal laws cannot be condemned as a threat to legal ethics. [377 US 7 (citations omitted).]

[10] As appellant points out in its brief, the effect of § 17 on the single-unit unaffiliated bargaining unit clearly presents a freedom of association problem. Section 17 dictates that the bargaining representative who is duly elected by the members of the unaffiliated local union and given the exclusive power to bargain on behalf of the union, cannot effectively exercise these powers. This is an infringement on the freedom to associate.

[11] See n 5.

part of membership, the designation of an exclusive bargaining representative with full veto power, the larger organization and the bargaining unit itself are subject to penalties. Therefore, § 17 effectively limits the groups with whom individuals may associate and penalizes those public employees who are already members of such an organization. By burdening or regulating the operations of the group as a whole, § 17 affects and burdens the associational rights afforded by the First Amendment to the individual.[12]

---

[12] Although not briefed or focused on by the parties, a strong argument can be made that § 17 of 1994 PA 112 operates as a bill of attainder. A bill of attainder is, as described by Tribe, "trial by legislature—the use of the lawmaking process, or of a trial-like process in a lawmaking setting, to inflict punitive disabilities on identifiable persons . . . ." Tribe, *supra*, § 10-4, p 641. The prohibition against bills of attainder is found at art I, § 9 of the United States Constitution and art 1, § 10 of the 1963 Michigan Constitution. Significantly, the bill of attainder prohibition is not predicated on any other constitutional amendment. It stands on its own and forms an independent basis for questioning constitutional validity. See, generally, Welsh, *The bill of attainder clause: An unqualified guarantee of process*, 50 Brook L R 77 (1983)."[T]he [United States] Supreme Court has consistently avoided narrow historical definitions of the [bill of attainder] clause in favor of a broader functional approach." Note, *Beyond process: A substantive rationale for the Bill of Attainder Clause*, 70 Va L R 475, 476-477 (1984). Further, the Court has broadly defined what may constitute punishment for bill of attainder jurisprudence, stating that "[t]he deprivation of any rights, civil or political, previously enjoyed, may be punishment [depending on] the circumstances attending and the causes of the deprivation . . . ." *Cummings v Missouri*, 71 US (4 Wall) 277, 320; 18 L Ed 356 (1866). This seldom discussed constitutional protection lends support to my conclusion that § 17 is unconstitutional.

In *United States v Brown*, 381 US 437; 85 S Ct 1707; 14 L Ed 2d 484 (1965), the United States Supreme Court held that a law making it a crime for one who belonged to the Communist Party to serve as a member of the executive board of a labor organization was a bill of attainder and therefore unconstitutional. The Court found that the statute "designates in no uncertain terms the persons who possess the feared characteristics and therefore cannot hold union office without incurring criminal liability—members of the Communist Party." 381 US 450. In the present case, it is clear that the Legislature enacted 1994 PA 112 because it was "troubled by the existence of K-12 public school employee strikes." Therefore, § 17, apart from affecting associational freedoms, targets specific individuals

The infringement by § 17 on individual rights cannot be ignored. In reality, § 17 restricts the individual public school employee from joining or participating in the organization of his choice. Specifically, § 17 mandates that, in order to have a voice, the individual public school employee join an association whose internal organization is not hierarchical in nature. See *ante* at 401-403. Through implementation of § 17, the Legislature has conditioned an individual's receipt of a protected benefit on an unconstitutional burden of associational freedoms. The Legislature may not grant an individual the benefit to collectively bargain, and then turn around and unconstitutionally burden the individual's pursuit of that benefit.

> [It is] clear that even though a person has no "right" to a valuable governmental benefit and even though the government may deny him the benefit for any number of reasons, there are some reasons upon which the government may not rely. It may not deny a benefit to a person on a basis that infringes his constitutionally protected interests—especially, his interest in freedom of speech. For if the government could deny a benefit to a person because of his constitutionally protected speech or associations, his exercise of those freedoms would in effect be penalized and inhibited. [*Perry v Sindermann*, 408 US 593, 597; 92 S Ct 2694; 33 L Ed 2d 570 (1972).]

I believe that "the wide latitude accorded by the Constitution to the freedoms of expression and association," *Healy v James*, 408 US 169, 194; 92 S Ct

---

within the labor organizations who, according to appellees, have the ability to incite disagreements that may culminate in strikes. Pursuant to the *Brown* holding, the Legislature may not designate persons who possess feared characteristics and legislatively inflict a deprivation on them. Thus, I briefly mention bill of attainder jurisprudence to set forth an additional constitutional framework within which § 17 may be examined.

2338; 33 L Ed 2d 266 (1972), undoubtedly calls for implication of such rights in the present case. Thus, guided by First Amendment jurisprudence and pursuant to art 1, §§ 3 and 5 of the Michigan Constitution, I would hold that the freedom of association extends to and is implicated in situations where legislation attempts to interfere with the internal structure and mechanics of membership organizations.

### B. HOW MUCH CONSTITUTIONAL PROTECTION IS NECESSARY?

As set forth above, it is clear that application of § 17 to the appellants does, to some extent, implicate freedom of association rights. However, not all associational relationships require the same level of constitutional protection. The United States Supreme Court has developed what appears to be a sliding scale approach when freedom of association rights are implicated. In *Roberts*, the United States Supreme Court stated:

> [There] lies a broad range of human relationships that may make greater or lesser claims to constitutional protection from particular incursions by the State. Determining the limits of state authority over an individual's freedom to enter into a particular association therefore unavoidably entails a careful assessment of where that relationship's objective characteristics locate it on a spectrum from the most intimate to the most attenuated of personal attachments. . . . We need not mark the potentially significant points on this terrain with any precision. We note only that factors that may be relevant include size, purpose, policies, selectivity, congeniality, and other characteristics that in a particular case may be pertinent. [468 US. 620.]

On the constitutional spectrum, I believe that the associational freedoms implicated by § 17 invoke the application of greater constitutional protection than

that applied in ordinary economic legislation cases. As demonstrated, § 17 effectively destroys the rights of the unions to internally govern and the rights of individuals to organize as they desire. These functions go to the heart of the effectiveness of any group or organization.[13]

In the briefs submitted to this Court, the parties disagree regarding the appropriate scrutiny applicable to the challenged act. The state argues that only a rational basis is appropriate. Conversely, the appellants contend that strict scrutiny should be applied when examining the constitutionality of § 17. Because § 17 infringes greatly on First Amendment freedom of association rights, I would apply an intense level of scrutiny rather than simply a rational basis test. Particularly, in instances such as this, I agree with the United States Supreme Court's statement in *NAACP* and would impose the "closest" scrutiny.

Typically, legislation that affects public employee labor unions is examined for a rational basis. However, as demonstrated, this case involves implication of the freedom of association. In *Brown v Alexander*, the United States Court of Appeals for the Sixth Circuit applied strict scrutiny when confronted with a freedom of association issue similar to the one presented in this case. The plaintiff union members challenged a Tennessee statute "which deprive[d] them and their unions of the benefit of payroll deductions for union dues," if they failed to satisfy certain

---

[13] Chief Justice BRICKLEY states that under my proposed holding and interpretation of § 17, there are five statutes in MCL 423.217; MSA 17.455(17), that would arguably infringe on the freedom of association. See *ante* at 376. In the absence of argument and briefing, his suggestion that the referenced statutes would be unconstitutional, while interesting, is premature.

articulated statutory conditions. 718 F2d 1420. Thus, other unions that met the statutory conditions were exempt from the statute and were permitted the benefit of a dues checkoff.

Initially, the court found that no essential First Amendment right was involved in the seeking of a dues checkoff provision.[14] However, the statute at issue conditioned dues checkoff on, inter alia, an independent employee organization.[15] Thus, the court examined statutory condition number 6, which implicated freedom of association concerns. The court struck this subsection of the act after applying strict scrutiny, stating:

---

[14] Just as dues checkoff is not a fundamental right, no one in this case contends that collective bargaining is fundamentally guaranteed by the First Amendment.

The court, in *Brown,* stated that the problem with the challenged statutory provision was it "enable[d] the state to differentiate between plaintiffs and other labor associations if either meets certain conditions and the other does not as to a dues checkoff privilege." *Id.* at 1423. Therefore, the underlying problem was in the nature of an equal protection violation. However, the court applied strict scrutiny, not on the basis of equal protection, but because a First Amendment freedom of association right was implicated.

[15] The statute read, in pertinent part:

[(a)] Officers and employees of the state may authorize deductions to be made from their compensation for the payment of membership dues in any employee associations or organizations that meet all of the following criteria:

\*        \*        \*

(6) Is an independent employee organization including, but not limited to, those who are not required to have their charter or by-laws approved by a parent or affiliate, can not be required to merge with another employee organization or unit, can not have its membership dues established by an affiliate or parent, can not be taken control of by a parent, affiliate or other labor organization for any reason whatsoever. [718 F2d 1419 (citation omitted).]

We believe this subsection directly limits freedom of association between labor organizations, and their members or members of other such organizations, and thus it could restrain or restrict freedom of association, a fundamental first amendment right. *The advocacy of particular policies and practices of parent or affiliated organizations may well be directly affected by this limitation, and thus it requires strict scrutiny* . . . .

*      *      *

*[T]he requirement that an organization be "independent" and non-affiliated with another labor organization strikes at the heart of freedom of association. Therefore we construe subsection (6) to require stricter scrutiny, that the state demonstrate a compelling interest to justify the limitation.* [718 F2d 1425-1426 (emphasis added).]

Although the court analyzed subsection 6 within the framework of equal protection, it applied strict scrutiny on the basis of the implication of the freedom of association. Like subsection 6 in *Brown*, § 17 of Act 112 strikes at the heart of freedom of association in that it intermeddles with the organizational structure of the groups and the associational relationships of individuals. See part I(A). Accordingly, I believe that § 17 must be examined under the powerful magnifying glass of strict scrutiny. The degree to which § 17 infringes on the internal workings of the organizations and individual freedoms in this case is to an extent I find to be constitutionally intolerable. The state has not demonstrated a compelling interest sufficient to justify this infringement on the freedom of association.[16] Therefore, § 17 cannot pass constitu-

---

[16] I agree with appellants. There has been no showing that giving individuals or affiliated organizations the final authority to approve or reject a collective bargaining agreement has had a demonstrable adverse effect on the actual operation of all school districts.

tional muster and must be stricken. Once the state chooses to give a benefit, even if it is not a fundamental right, the state cannot impose an unconstitutional burden on that benefit.[17] The Legislature has attempted to infringe on the freedom of association in the context of public employee collective bargaining. This cannot be tolerated.[18]

---

Further, appellee Michigan Employment Relations Commission argues that 1994 PA 112 attempts to level the playing field in the situation where a single local school district is required to bargain with a multidistrict bargaining unit. Amicus curiae, Michigan Association of School Boards, bolsters this view and states that § 17 was a response to the "imbalance between public school unions and employers in the ratification of agreements and its detrimental effect on the collective bargaining process . . . ." The MERC relies on *Combined Hebrew/Yiddish Cultural Schools*, 1969 MERC Lab Op 486, for the proposition that "[e]mployers lack the corresponding ability to engage in multi-employer associations." *Hebrew/Yiddish Cultural Schools* held that an employer "cannot . . . submit [a] tentative agreement reached to a third party and allow that third party, who is a stranger to the negotiations, to exercise a veto over the whole agreement." 1969 MERC Lab Op 490. Whether employers are legally able to form multiemployer associations is an open question, not presented to this Court and clearly answerable by the Legislature.

[17] In the present case, the Court of Appeals stated that "[i]f the state is not constitutionally required to recognize public-sector bargaining, then it follows that the state may impose restrictions or conditions on public-sector bargaining, as long as those conditions or restrictions are not otherwise unlawful." 212 Mich App 472, 480; 538 NW2d 433 (1995).

[18] Apparently, Justice LEVIN believes that this is an improper time to evaluate the constitutionality of § 17 and further, that declaratory relief is inappropriate. The state does not and cannot dispute that the purpose of this act is to interdict the abilities of the MEA to compel conformity. The state not only does not suggest that declaratory relief is inappropriate because of the absence of a factual record, it offers factual hypothesis intended to narrow the scope of the statute. The state contends that at this stage, and even after application in the manner it suggests, § 17 is constitutional. I disagree.

II

CONCLUSION

Because I believe that § 17 imposes an unconstitutional infringement on the freedom of association guaranteed by the First Amendment, I would reverse the decision of the Court of Appeals regarding § 17. In the absence of the ability to garner a majority willing to find § 17 unconstitutional on its face, I agree with Justice LEVIN that the portions of the Court of Appeals and trial court opinions that find § 17 constitutional should be vacated. I agree with Chief Justice BRICKLEY that the remaining provisions of 1994 PA 112 are constitutional.

CAVANAGH and BOYLE, JJ., concurred with MALLETT, J.