VARGO v SAUER

Docket No. 106262. Argued January 8, 1998 (Calendar No. 14). Decided April 21, 1998. Rehearing denied *post*, 1206.

Lois Vargo, as personal representative of the estate of Janet Vargo, deceased, brought a medical malpractice action in the Ingham Circuit Court against Harold Sauer, M.D., St. Lawrence Hospital, and others, alleging that Dr. Sauer negligently failed to diagnose Janet Vargo's congestive heart failure, resulting in her death during childbirth. The court, Peter D. Houk, J., dismissed the plaintiff's claim on the basis of governmental immunity, finding Dr. Sauer to be a governmental employee, acting within his scope of employment, because of his status as an associate professor in the Michigan State University College of Human Medicine and his participation in the Michigan State University/St. Lawrence Hospital Family Practice Residency Program. The Court of Appeals, CORRIGAN, P.J., and MARKEY, J. (J. R. ERNST, J., dissenting), affirmed (Docket No. 165179). The plaintiff appeals.

In an opinion by Justice BRICKLEY, joined by Chief Justice MALLETT, and Justices BOYLE, WEAVER, and TAYLOR, the Supreme Court *held*:

The hospital exception does not apply in this case. The trial court's dismissal of this action was premature because a factual issue was presented with respect to whether Dr. Sauer was acting in the course of his employment solely on behalf of Michigan State University or whether he was simultaneously operating as an agent of St. Lawrence Hospital.

1. MCL 691.1407(4); MSA 3.996(107)(4) specifically allows tort liability to be imposed on a governmental agency for injuries arising out of the ownership or operation of a public hospital or county medical facility. The MSU residency program does not fall within the statutory definition of "hospital." While MSU may operate a residency program, it is not an operator of a hospital, and, thus, the hospital exception does not apply.

2. Subsection 7(2) provides immunity from tort liability to a person who is an employee of a governmental agency and who causes injury while in the course of employment. The governmental agency must be engaged in the exercise or discharge of a govern-

mental function before immunity may be invoked. Thus, Dr. Sauer was required to be engaged in a governmental function at the time of the alleged negligence that was being performed on behalf of a governmental agency. A governmental function is an activity that is expressly or impliedly mandated or authorized by constitution, statute, or other law. It is undisputed that MSU, as an extension of the state, is entitled to invoke sovereign immunity. The broad language of MCL 390.101; MSA 15.1121 confers on MSU the power to teach medicine and therefore qualifies as a governmental function. Thus, Dr. Sauer was performing a governmental function during the relevant period of the alleged negligence.

3. Subsection 7(2) grants immunity only to a person who is an employee of a governmental agency while in the course of employment. The definition of "governmental agency" does not include, or remotely contemplate, joint ventures, partnerships, arrangements between governmental agencies and private entities, or any other combined state-private endeavors. A physician may have a dual employment status and therefore be subject to the general laws of agency. The general rules of agency should be applied to a hospital setting in the same manner as any other employment setting. The principles related to dual agency are analogous to the realities of hospital employment in general and, in particular, to the factual situation in the present case. There is no indication that the governmental immunity statute remotely contemplates a grant of immunity for agents who simultaneously are serving a private entity.

4. A material question of fact remains for trial. The record establishes that Dr. Sauer had staff privileges at St. Lawrence Hospital, treated a number of private patients there on an on-call basis, and, at the time of the alleged negligence, was treating Janet Vargo as a private patient in the MSU/St. Lawrence Family Practice Residency Program. Irrespective of Dr. Sauer's performance of a governmental function, a question of fact exists with regard to whether he was simultaneously operating as an agent of St. Lawrence Hospital.

Justice CAVANAGH, joined by Justice KELLY, concurring, stated that the constitutional issue should not have been reached because it was not necessary to resolve this case. In addition, this plaintiff did not have actual or constructive knowledge that the physician who was treating her was not a private physician, but instead was a Michigan State University physician cloaked with governmental immunity.

Reversed and remanded.

215 Mich App 389; 547 NW2d 40 (1996) reversed.

*Thurswell, Chayet & Weiner* (by *Tammy J. Reiss*) for plaintiff-appellant.

*Fraser, Trebilcock, Davis & Foster, P.C.* (by *Brett J. Bean* and *Charyn K. Hain*), for defendant-appellee.

Amicus Curiae:

*Granzotto & Nicita, P.C.* (by *Angela J. Nicita*), for Michigan Trial Lawyers Association.

BRICKLEY, J. This case arises out of an action for medical malpractice involving the death of twenty-year-old Janet Vargo after she gave birth to her son at St. Lawrence Hospital in Lansing. Plaintiff, as personal representative of the estate of Janet Vargo, asserted that defendant-appellee Dr. Harold Sauer, a Michigan State University medical professor who instructs medical residents and treats patients at St. Lawrence, negligently caused Ms. Vargo's death. Dr. Sauer moved for summary disposition, arguing that he was entitled to immunity pursuant to subsection 7(2) of the governmental tort immunity statute.[1] Plain-

---

[1] MCL 691.1407(2); MSA 3.996(107)(2) provides that employees of governmental agencies:

> shall be immune from tort liability for injuries to persons or damages to property caused by the [employee] while in the course of employment . . . while acting on behalf of a governmental agency if all of the following are met:
>
> (a) The [employee] is acting or reasonably believes he or she is acting within the scope of his or her authority.
>
> (b) The governmental agency is engaged in the exercise or discharge of a governmental function.
>
> (c) The [employee's] conduct does not amount to gross negligence . . . .

Plaintiff has abandoned her initial claim that Dr. Sauer's conduct amounted to gross negligence.

tiff responded that Dr. Sauer did not satisfy the requirements of subsection 7(2) and that, in any event, subsection 7(4) does not grant immunity to agents of government hospitals.[2] The trial court dismissed plaintiff's claim on the basis of governmental immunity and a divided Court of Appeals affirmed the dismissal. We accepted review to consider 1) whether the hospital exception is constitutional and, if it is, whether it governs this case, and 2) whether a question exists to submit to the jury in regard to whether Dr. Sauer is entitled to immunity under subsection 7(2).

On the first question, we find that although the hospital exception is not constitutionally infirm, it does not control our disposition of this case. On the second question, we hold that the trial court's dismissal of this action was premature because a factual issue was presented with respect to whether Dr. Sauer was acting "in the course of [his] employment" solely on behalf of MSU or whether he was simultaneously operating as an agent of St. Lawrence Hospital. We therefore reverse the trial court's grant of summary disposition, and remand this case to the circuit court for further proceedings limited to plaintiff's claim of medical malpractice arising from Dr. Sauer's relationship with St. Lawrence Hospital.

---

[2] MCL 691.1407(4); MSA 3.996(107)(4), otherwise known as the "hospital exception" provides:

This act does not grant immunity to a governmental agency with respect to the ownership or operation of a hospital or county medical care facility or to the agents or employees of such hospital or county medical care facility.

I

The material facts appearing in the record establish that on the morning of July 3, 1990, twenty-year-old Janet Vargo visited St. Lawrence Hospital complaining of difficulties associated with her pregnancy. After an electrocardiogram examination indicated an irregular heart rate, the hospital staff instructed Ms. Vargo to visit the office of her personal physician, Dr. James Rawlinson. Dr. Rawlinson examined her and, after her complaints of chest tightness and shortness of breath persisted, instructed her to return to St. Lawrence. Ms. Vargo was subsequently admitted to St. Lawrence, where she was examined by, among others, medical residents from the Michigan State University Medical School. Later that evening, Dr. Rawlinson consulted with defendant-appellee Dr. Harold Sauer, who was "on call" at St. Lawrence, in regard to Ms. Vargo's condition. Dr. Sauer examined Ms. Vargo, arranged for an immediate Cesarean section, and at 12:29 A.M., a healthy boy was delivered. Shortly after the delivery, however, Ms. Vargo developed severe bradycardia and cardiac arrest, and lapsed into a comatose state where she remained until the removal of life support approximately six weeks later.

Defendant-appellee Dr. Harold Sauer has been an associate professor in obstetrics, gynecology and reproductive biology with the Michigan State University College of Human Medicine since 1985, and in this capacity instructs medical students and residents. MSU's status is unique among the universities providing medical schools in Michigan. Unlike Wayne State University and the University of Michigan, both of which operate hospitals as an adjunct to their medical school, MSU lacks its own hospital facility and con-

sequently operates its residency program through privately owned hospitals such as St. Lawrence. Apparently in exchange for the use of these facilities, MSU physicians provide services on a rotation or "on call" basis. MSU medical faculty receive a fixed annual salary from MSU and the affiliated hospitals pay MSU the patient fees generated by MSU faculty and residents.

The present case concerns the "Michigan State University/St. Lawrence Hospital Family Practice Residency Program" at the privately owned St. Lawrence Hospital.[3] Although the specifics surrounding the affiliation between MSU and St. Lawrence are unclear, the record establishes that Dr. Sauer had staff privileges at St. Lawrence and provided in-patient medical care and treatment to private patients there.

Plaintiff commenced this suit for medical malpractice in Ingham Circuit Court in January 1992 against St. Lawrence Hospital, Dr. Rawlinson, and Dr. Sauer. St. Lawrence settled the claim for $700,000, and Dr. Rawlinson was dismissed with prejudice by stipulation of the parties. Plaintiff's complaint alleged that Dr. Sauer negligently failed to diagnose Ms. Vargo's congestive heart failure, thereby resulting in massive cardiorespiratory arrest during childbirth.

During the course of litigation, Dr. Sauer filed a motion for summary disposition on the basis that, as an employee of MSU, he was entitled to immunity under subsection 7(2). Plaintiff responded that subsection 7(4), rather than subsection 7(2), controls the present case. Plaintiff contended that the arrange-

---

[3] Although Dr. Sauer now asserts that he was on call for the "MSU OB/GYN Department," his motion for summary disposition stated that Ms. Vargo was treated at the "Michigan State University/St. Lawrence Hospital Family Practice Residency Program."

ment between MSU and St. Lawrence makes MSU an
"operator" of a government hospital, thereby trigger-
ing the hospital exception to immunity. Plaintiff also
argued that notwithstanding subsection 7(4), the
activity that gave rise to the claim of medical mal-
practice did not take place during "the course of
employment" nor "on behalf of a governmental
agency," pursuant to subsection 7(2)'s mandate.

In May 1993, the trial court granted Dr. Sauer's
motion for summary disposition pursuant to MCR
2.116(C)(7) (immunity granted by law), and MCR
2.116(C)(10) (no genuine issue of material fact),
finding:

> Dr. Sauer is a governmental employee. He was acting
> within the scope of his employment. His sole remuneration
> comes from the university. He responded to a call to the
> Michigan State University OB/GYN clinic.
>
> There were residents involved in this case. It is a neces-
> sary portion or part of his employment that, in addition to
> the teaching function, the direct and what I will term as a
> classroom or pedagogical type of function, he also main-
> tained his skill level. So, I have no trouble in finding that
> this is within the scope of his employment.

Judge Houk expressed some reluctance with his rul-
ing, observing that the hospital exception treated
patients of MSU physicians differently than those
treated by other university-employed physicians.[4]

---

[4] Judge Houk remarked: "I am . . . substantially concerned. I think
this is an area that the Legislature has, frankly, created the opportunity
for unfair treatment. My concern . . . is not that governmental immunity
is unfair. It is that if there's going to be governmental immunity, it should
be for persons who are similarly situated, and I'm having a substantial
problem in distinguishing between persons who check themselves in at
the University of Michigan Hospital and at St. Lawrence. And I think what

Before the entry of final order, plaintiff moved that Dr. Sauer produce contractual and other documentary evidence relating to the relationship between St. Lawrence Hospital and MSU. Judge Houk summarily denied the request and entered the order granting summary disposition.

On appeal, plaintiff asserted that a grant of immunity under subsection 7(2) was improper because Dr. Sauer's treatment of Ms. Vargo was not undertaken on behalf of MSU nor did it involve the performance of a governmental function. Plaintiff also argued that MSU "operated" a hospital pursuant to subsection 7(4) and that, in the alternative, the hospital exception violates the Equal Protection Clause of the Michigan Constitution because it "fails to treat all university-employed physicians [in Michigan] in a like manner with regard to governmental immunity."

A divided Court of Appeals rejected plaintiff's arguments and affirmed the trial court's dismissal, ruling that Dr. Sauer was entitled to the defense of governmental immunity. 215 Mich App 389; 547 NW2d 40 (1996). We granted leave to appeal, and now reverse the decision of the Court of Appeals.

II

We begin with the fundamental principle that governmental agencies are statutorily immune from tort liability "[e]xcept as otherwise provided."[5] In *Ross v Consumers Power Co (On Rehearing)*, 420 Mich 567,

---

troubles me even more is that a person who checks themselves [sic] into St. Lawrence Hospital is unsuspecting."

[5] Subsection 7(1) of the governmental tort liability act provides:

Except as otherwise provided in this act, all governmental agencies shall be immune from tort liability in all cases wherein the

618; 363 NW2d 641 (1984), we characterized § 7 as a "broad grant of immunity" subject to "narrowly drawn statutory exceptions."[6] Although the general effect of the 1986 amendments to the governmental tort liability act was to preserve, and in some instances to expand, the immunity available to governmental agencies and their employees, the amendments also created a fifth exception to immunity.[7] As spelled out above, subsection 7(4) specifically allows tort liability to be imposed on a governmental agency other than the Department of Mental Health or Department of Corrections for injuries arising out of the ownership or operation of a public hospital or county medical facility.[8] Since *Ross*, this Court has repeatedly affirmed the proposition that statutory exceptions to

government agency is engaged in the exercise or discharge of a governmental function. [MCL 691.1407(1); MSA 3.996(107)(1).]

[6] In *Ross*, we intentionally "redefined the entire governmental-immunity landscape." *Hadfield v Oakland Co Drain Comm'r*, 430 Mich 139, 153; 422 NW2d 205 (1988). As one commentator observes, the law of governmental immunity before *Ross* was "a conflicting morass" characterized by constantly changing definitions of governmental function, with different immunities for different levels of government and government officials. After *Ross* and the 1986 tort reform legislation, "the meaning of governmental function is now relatively fixed . . . , and the law of governmental immunity has been clarified." Baylor, Governmental Immunity in Michigan, § 6.59, p 6-66.

[7] The four other categorical statutory exceptions impose tort liability for: the performance of a proprietary, as opposed to a governmental, function, MCL 691.1413; MSA 3.996(113); the failure to maintain highways in reasonable repair, MCL 691.1402; MSA 3.996(102); the negligent operation of a government-owned vehicle by a government officer, agent, or employee, MCL 691.1405; MSA 3.996(105); and the failure to repair and maintain public buildings under government control, MCL 691.1406; MSA 3.996(106).

[8] MCL 691.1407(4); MSA 3.996(107)(4).

governmental immunity are to be narrowly construed.[9]

A

We first consider plaintiff's argument that the hospital exception to immunity controls the present case. Plaintiff contends that the legislative purpose in enacting subsection 7(4) was to exempt the *entire* practice of medicine from the otherwise broad grant of governmental immunity under subsection 7(2). In furtherance of this argument, plaintiff insists that the Legislature did not intend to extend governmental immunity to a physician employed by MSU.

Subsection 7(4) exempts from immunity governmental agencies that own or operate a "hospital" or "county medical care facility." Plaintiff does not allege that a county medical care facility is involved, and therefore her argument depends on whether a residency program qualifies as a "hospital."

The rules of statutory construction are well established. First and foremost, we must give effect to the Legislature's intent. *Reardon v Dep't of Mental Health*, 430 Mich 398, 412; 424 NW2d 248 (1988). If the language of a statute is clear and unambiguous, the plain meaning of the statute reflects the legislative intent and no further construction is required or permitted. *Turner v Auto Club Ins Ass'n*, 448 Mich 22, 27; 528 NW2d 681 (1995). However, when a statute specifically defines a given term, that definition alone controls. *Tryc v Michigan Veterans' Facility*, 451 Mich

---

[9] See, e.g., *Wade v Dep't of Corrections*, 439 Mich 158, 166; 483 NW2d 26 (1992), citing *Hyde v Univ of Michigan Bd of Regents*, 426 Mich 223, 245; 393 NW2d 847 (1986); *Scheurman v Dep't of Transportation*, 434 Mich 619, 627; 456 NW2d 66 (1990).

129, 135; 545 NW2d 642 (1996). Applying these principles, the definition of "hospital" supplied in the statute, being clear and unambiguous, controls.

A "hospital," as defined in subsection 7(4)(b), means:

> [A] facility offering inpatient, overnight care, and services for observation, diagnosis, and active treatment of an individual with a medical, surgical, obstetric, chronic, or rehabilitative condition requiring the daily direction or supervision of a physician.

A review of the record indicates that MSU's residency program does not "offer[] inpatient, overnight care" or related services and therefore does not fall within the meaning of "hospital" as defined by the statute. Thus, while MSU may operate a residency program, we do not find that MSU is an operator of a *hospital*. Accordingly, we uphold the Court of Appeals determination that the hospital exception does not apply in this case.[10]

B

Plaintiff also challenges the constitutionality of subsection 7(4), arguing that the hospital exception violates equal protection guarantees because it treats patients treated by MSU physicians working at private

---

[10] Plaintiff calls our attention to recent legislative activity directed toward amending subsection 7(4) in a manner that would remove the cloak of immunity for all governmental agencies providing medical care, including presumably, MSU medical faculty and residents. Plaintiff maintains that this recent activity reflects the Legislature's *original* intent that the hospital exception was to include MSU physicians working in private hospitals. Notwithstanding the clear and unambiguous language of subsection 7(4), we do not share plaintiff's notion that this present legislative activity conclusively represents legislative intent at the time the hospital exception was enacted.

hospitals differently from those treated by all other university-employed physicians. More specifically, plaintiff maintains that the hospital exception, when viewed in the context of MSU's unique arrangement with local private hospitals, creates a situation in which similarly situated patients are subjected to disparate rights of recovery.[11]

Our state constitution declares that "[n]o person shall be denied the equal protection of the laws . . . ."[12] We have interpreted our Equal Protection Clause to offer similar protection as the wording of the parallel clause in the United States Constitution. *Doe v Dep't of Social Services*, 439 Mich 650, 660; 487 NW2d 166 (1992). The United States Supreme Court's constitutional jurisprudence teaches that an "equal protection analysis requires strict scrutiny of a legislative classification only when the classification impermissibly interferes with the exercise of a fundamental right or operates to the peculiar disadvantage of a suspect class."[13] Because, there is no fundamental right or suspect classification involved, the rational-basis standard of review governs in the present case. We uphold a statute under that standard if it furthers a legitimate governmental interest and if the challenged classification is rationally related to achieving that interest. *Michigan State AFL-CIO v*

---

[11] Plaintiff particularly takes issue with the *effect* of the legislation, arguing that it unfairly precludes a patient from suing an MSU physician while permitting a patient to sue, for instance, a University of Michigan physician providing treatment at a University of Michigan hospital or, for that matter, any other hospital.

[12] Const 1963, art 1, § 2.

[13] *Massachusetts Bd of Retirement v Murgia*, 427 US 307, 312; 96 S Ct 2562; 49 L Ed 2d 520 (1976), citing *San Antonio Independent School Dist v Rodriguez*, 411 US 1, 16; 93 S Ct 1278; 36 L Ed 2d 16 (1973).

*MERC*, 453 Mich 362, 381; 551 NW2d 165 (1996). Legislation challenged on equal protection grounds is accorded a presumption of constitutionality, and our inquiry is therefore " 'restricted to the issue whether any state of facts either known or which could reasonably be assumed affords support for it.' " *Shavers v Attorney General*, 402 Mich 554, 613-614; 267 NW2d 72 (1978).[14]

Although there is some resonance to plaintiff's perceptions regarding the "unfairness" of the hospital exception,[15] we find that subsection 7(4) passes constitutional muster, albeit for a different rationale than the one advanced by the Court of Appeals. In response to plaintiff's contention that subsection 7(4) was violative of equal protection, the Court of Appeals stated:

> [T]he statutory scheme is nonetheless rationally related to a legitimate governmental purpose: i.e., the state will permit governmental employees to be sued in tort where they presumably have input regarding control over operations at the government-run hospital where the alleged malpractice occurs. Thus, governmental employees working at private hospitals as part of their governmental function who have no input or control regarding hospital operations cannot be sued for malpractice occurring at the private hospital. Also, extending immunity to physicians under these circumstances encourages medical schools to become involved in providing medical care in their communities when the

---

[14] Quoting *United States v Carolene Products Co*, 304 US 144, 154; 58 S Ct 778; 82 L Ed 1234 (1938).

[15] We note that even if a law treats groups of individuals in a disparate manner, the statutory scheme does not necessarily violate the guarantee of equal protection. *Doe, supra* at 661. We are equally mindful that whenever the defense of governmental immunity is invoked, there will usually be the appearance of unfairness. However, as we observed in *Ross, supra* at 618-619, the Legislature's disparate treatment of public and private tortfeasors is not unjustifiable per se.

school does not own or operate its own hospital or medical facility. 215 Mich App 397 (citations omitted).]

According to the Court of Appeals, the Legislature had a rational basis for providing disparate rights of recovery from physicians of differing public schools because physicians "presumably" have "input or control" at a government-run hospital. We are unable to agree with this analysis because subsection 7(4) states:

> This act does not grant immunity to a governmental agency with respect to the ownership or operation of a hospital . . . *or to the agents or employees of such hospital* . . . .[16]

A facial examination of the foregoing language reveals that a physician employed by a government hospital who treats a patient at a *private* hospital is also *not* immune under the act, despite the fact that the governmental agency presumably has no "input or control" over the operations of the private hospital. The same is not true for MSU physicians under the rationale advanced by the Court of Appeals, because such individuals may be entitled to immunity[17] at both a public hospital *and* a private hospital, with immunity in each instance premised on the fact that MSU does not own or operate its own hospital.[18] That is,

---

[16] MCL 691.1407(4); MSA 3.996(107)(4) (emphasis added).

[17] As long as the agent satisfies the requisite elements set forth in subsection 7(2).

[18] We note that subsection 7(4) does *not* state the following:

> This act does not grant immunity to a governmental agency with respect to the ownership or operation of a hospital . . . or to the agents or employees of such hospital [*only while working at such hospital*].

even under an "input and control" rationale, the act still abrogates immunity for a government-employed physician treating patients at a private hospital, even though that physician presumably has no input or control over the private hospital solely on the basis that the physician's "primary employer," such as the University of Michigan, happens to own its own hospital. In light of those considerations, we cannot support the rationale proffered by the Court of Appeals.

Notwithstanding our disagreement with the Court of Appeals rationale, we find more plausible the assertion advanced at oral argument by counsel for Dr. Sauer that the Legislature may have decided that state-supported medical schools that choose to own or operate their own hospital, thereby presumably receiving a large source of revenue from operation of that hospital, would not receive, along with state funding, the additional benefit of governmental immunity that is normally available under subsection 7(2). We agree that the Legislature may have decided not to extend immunity to those agencies who choose to own and operate their own hospitals because they presumably are in a better position to offer their employees, among other benefits, liability insurance. Mindful of the presumption of constitutionality and the accompanying limited inquiry we give statutes such as the one that is being challenged here, *Shavers, supra* at 613-614, we find that there is a rational basis for the disparate rights of recovery under the governmental tort immunity statute. Accordingly, we

hold that subsection 7(4) does not deprive plaintiff of equal protection of the law.[19]

### III

We now consider Dr. Sauer's argument that he is entitled to immunity under subsection 7(2) of the governmental tort immunity act. As set out above, subsection 7(2) provides immunity from tort liability to an individual who is an "employee of a governmental agency" and who causes injury "while in the course of employment."[20] The governmental agency by whom the individual is employed must also be "engaged in the exercise or discharge of a governmental function" before immunity may be invoked.[21] In the present case, the parties do not dispute that the cloak of governmental immunity is "alive and well" in Michigan, but rather dispute whether that cloak is large enough to encompass Dr. Sauer. A divided Court of Appeals upheld the trial court's dismissal of plaintiff's claim. The majority concluded that Dr. Sauer is entitled to immunity because he was performing a governmental function on behalf of a governmental agency at the time of the alleged negligence, while the dissent opined that dismissal of the claim was premature

---

[19] Plaintiff admits that if we were to invalidate subsection 7(4) on constitutional grounds, Dr. Sauer would still be entitled to immunity (dependent, of course, on his satisfaction of the requisite elements set forth in subsection 7[2]). Consequently, she asks that we "rewrite" the provision in a manner that would extend the hospital exception to *all* state-employed physicians engaged in the practice of medicine. Because we find that the hospital exception does not violate equal protection guarantees, we decline this invitation to judicially amend the statute. Moreover, if our interpretation of subsection 7(4) does not comport with the Legislature's intent, the Legislature may amend the statute, an option which, the parties inform us, that body is now considering.

[20] MCL 691.1407(2); MSA 3.996(107)(2).

[21] MCL 691.1407(1); MSA 3.996(107)(1).

because a factual question existed with respect to whether Dr. Sauer was simultaneously "an agent of St. Lawrence Hospital" at the time of the alleged negligence.[22]

As prologue to our inquiry into whether Dr. Sauer is entitled to immunity, we note that for purposes of the present action, subsection 7(2) contemplates the satisfaction of two elements before Dr. Sauer may be cloaked with governmental immunity: first, whether Dr. Sauer was engaged in a "governmental function" at the time of the alleged negligence and, if so, whether his performance of that function was "on behalf of a governmental agency."

A

Plaintiff argues that Dr. Sauer was not performing a governmental function when he treated Janet Vargo. We disagree. In *Ross, supra* at 620, we held that a "governmental function" is an activity that is expressly or impliedly mandated or authorized by constitution, statute, or other law. At that time, we expressly recognized that the definition we formulated was so broad that it would encompass most activities that a government might undertake. *Id.* at 620-621. In 1986, the Legislature codified the definition we set forth in *Ross*:

> "Governmental function" is an activity which is expressly or impliedly mandated or authorized by constitution, statute, local charter or ordinance, or other law. [MCL 691.1401(f); MSA 3.996(101)(f).]

----

[22] 215 Mich App 403.

Significantly, the Legislature did not limit the *Ross*-definition in any respect, and in fact broadened the definition by adding "local charter or ordinance" to the list of definitional sources of legal authority from which immunity may spring.[23]

It is undisputed that MSU, as an extension of the state, generally is entitled to invoke sovereign immunity.[24] Under MCL 390.101; MSA 15.1121, Michigan State University is directed to

> provide the inhabitants of this state with the means of acquiring a thorough knowledge of . . . science . . . and to this end it shall afford such instruction in science, art and literature as, in the judgment of its governing body, will promote the object of the institution.

Pursuant to this authority, the MSU Board of Trustees established the MSU College of Human Medicine in 1964.

Affidavits submitted by MSU establish that it is the judgment of MSU that a vital part of providing a medical education is hands-on experience and that it is necessary for its faculty and medical residents to be exposed to the patient population at hospitals such as

---

[23] In *Reardon v Dep't of Mental Health, supra* at 412, we discussed the Legislature's approval and adoption of the expansive immunity articulated in *Ross* and observed:

> We invited statutory modification of this definition [of governmental function] in the event that it did not reflect the Legislature's intent regarding the scope of immunity. . . . The Legislature declined this invitation . . . [and] [i]n so doing, the Legislature puts its imprimatur on the broad scope of immunity as defined in *Ross* and, by implication, the narrow scope of the exception.

[24] The Legislature has included "public universit[ies]" in its definition of the "State" for purposes of immunity. MCL 691.1401(c); MSA 3.996(101)(c).

St. Lawrence. The broad language of MCL 390.101;
MSA 15.1121 confers on MSU the power to teach
medicine and therefore qualifies as a "governmental
function," and we believe that common sense dictates
that teaching and rendering medical care are necessarily
intertwined in a medical school setting.[25] Because
the parameters of governmental immunity pursuant to
the governing statute clearly contemplate a broad
reading of "governmental function," we accordingly
find that Dr. Sauer was performing a governmental
function during the relevant period of the alleged
negligence.[26]

B

Although we have determined that Dr. Sauer was
performing a "governmental function" for purposes of
the immunity statute, our inquiry is not complete, as
subsection 7(2) also mandates an examination of the

---

[25] Plaintiff urges that we examine the *specific* activity performed by Dr.
Sauer in determining whether that conduct is a "governmental function."
We reject this proffered analytical inquiry because it is materially different
from our pronouncement in *Ross*, later reaffirmed in *Smith v Dep't of
Public Health*, 428 Mich 540; 410 NW2d 749 (1987), aff'd sub nom *Will v
Michigan Dep't of State Police*, 491 US 58; 109 S Ct 2304; 105 L Ed 2d 45
(1989), that the proper focus is on the general activity that is being performed
at the time of the alleged tort.

[26] Plaintiff contends that the enactment of subsection 7(4) means that
the provision of medical treatment is not a governmental function, therefore
restoring our ruling in *Parker v Highland Park*, 404 Mich 183; 273
NW2d 413 (1978), which held that public hospitals were not entitled to
governmental immunity. We are unpersuaded by this argument because
we determined in *Hyde v Univ of Michigan Bd of Regents*, n 9 *supra*, that
*Ross* "impliedly overruled" *Parker*. Although none of the cases decided in
*Ross* involved tort liability for medical malpractice, *Ross* rejected each
definition of governmental function used in *Parker*. Thus, to the extent
that *Parker* held that public hospital activities that are "expressly or
impliedly mandated or authorized by constitution, statute, or other
law . . . do not constitute a governmental function, *Parker* was impliedly
overruled by *Ross*." *Hyde* at 243.

*employment status* of the individual seeking immunity. By its very terms, subsection 7(2) grants immunity only to an individual who is an "employee of a governmental agency . . . while in the course of employment."[27]

The governmental tort liability act defines "governmental agency" as

> the state, political subdivisions, and municipal corporations. [MCL 691.1401(d); MSA 3.996(101)(d).]

We agree with the Court of Appeals dissenting opinion that the definition of "governmental agency" does not include, or remotely contemplate, joint ventures, partnerships, arrangements between governmental agencies and private entities, or any other combined state-private endeavors.[28]

Consistent with that consideration, we note that it is axiomatic that an individual may serve two masters simultaneously. This principle found its genesis in our jurisprudence well over a century ago[29] and has achieved contemporary expression in the Restatement (Second) of Agency and a number of other authorities.[30] The Restatement's hornbook rule states:

---

[27] MCL 691.1407(2); MSA 3.996(107)(2).

[28] The act provides exhaustive definitions of "political subdivision," "Municipal corporation" and "State," none of which mention or contemplate a private hospital or arrangements between governmental agencies and private entities. See MCL 691.1401(a), (b), (c); MSA 3.996(101)(a), (b), (c).

[29] See, e.g., *Adams Mining Co v Senter*, 26 Mich 73 (1872).

[30] See, e.g., *NLRB v Town & Country Electric, Inc*, 516 US 85; 116 S Ct 450; 133 L Ed 2d 371 (1995); *Kelley v Southern Pacific Co*, 419 US 318, 324; 95 S Ct 472; 42 L Ed 2d 498 (1974) (stating that an employee "could be deemed to be acting for two masters simultaneously"); Seavey, Law of Agency, § 85, p 146; 30 CJS, Employer-Employee, § 200, pp 282-283, 290.

> A person may be the servant of two masters, not joint
> employers, *at one time as to one act,* if the service to one
> does not involve abandonment of the service to the other.
> [1 Restatement Agency, 2d, § 226, p 498 (emphasis added).]

According to the comments to § 226, dual agency occurs when two persons or entities agree to share the services of an individual for a single act.[31] It is also well established that a physician may have a dual employment status and therefore be subject to the general laws of agency. *Barnes v Mitchell,* 341 Mich 7, 19; 67 NW2d 208 (1954).[32]

We believe that the general rules of agency as set forth in our jurisprudence and the Restatement remain sound and, as a basic principle, should be applied to the hospital setting in the same manner as any other employment setting. By logical extension, we see no reason why their application to individuals such as faculty members providing instruction and treatment in a hospital should not be applied with the same rigor as they are to other hospital employees who may also be performing for two principals.[33] We find that the principles related to dual agency are analogous to the realities of hospital employment in

---

[31] 1 Restatement Agency, 2d, § 226, comment b, p 500. We recognized the viability of 1 Restatement Agency, 2d, § 226 in *Nash v Sears, Roebuck & Co,* 383 Mich 136, 139-140; 174 NW2d 818 (1970).

[32] In a number of other contexts, our intermediate appellate courts have found instances where physicians have acted as an agent of more than one principal. See, e.g., *Whitmore v Fabi,* 155 Mich App 333; 399 NW2d 520 (1986); *Rambus v Wayne Co General Hosp,* 193 Mich App 268, 273; 483 NW2d 455 (1992), reaff'd *(On Rehearing),* 197 Mich App 480; 495 NW2d 835 (1992).

[33] Notwithstanding the broad grant of immunity to governmental agents, the Legislature has authorized a governmental agency, in its discretion, to purchase liability insurance, offer settlements, and indemnify its officers, employees, and agents for their alleged torts. MCL 691.1408; MSA 3.996(108), MCL 691.1409; MSA 3.996(109).

general and, in particular, to the factual situation in the present case.[34]

C

In the present case, it is uncontested that Dr. Sauer had staff privileges at St. Lawrence and regularly treated patients there. The record also indicates that Janet Vargo was admitted to St. Lawrence Hospital and treated by Dr. Sauer during the period of the alleged negligence. Finally, Dr. Sauer's motion for summary disposition asserted that he provided consultative services through the "Michigan State University/St. Lawrence Hospital Family Practice Residency Program."

The circuit court granted Dr. Sauer's motion for summary disposition pursuant to MCR 2.116(C)(7) (governmental immunity), and MCR 2.116(C)(10) (no genuine issue of material fact). In deciding a motion for summary disposition on the basis of governmental immunity, a court must consider all documentary evidence filed or submitted by the parties. *Patterson v Kleiman*, 447 Mich 429; 526 NW2d 879 (1994). Dr. Sauer's motion for summary disposition on the basis of governmental immunity stated that he "provide[d] consultative services through the Michigan State University/St. Lawrence Hospital Family Practice Residency Program." Under MCR 2.116(C)(10), summary

---

[34] The application of dual agency principles in the context of a hospital setting is not a novel concept and has engendered ample exposition elsewhere. See, e.g., *Abraham v United States*, 932 F2d 900, 903 (CA 11, 1991) ("[a]s the Restatement makes clear, a single act may be done with the purpose of benefiting two masters and both may then be liable for the servant's negligence"); *Aldridge v Hartford Hosp*, 969 F Supp 816 (D Conn, 1996); *City of Somerset v Hart*, 549 SW2d 814 (Ky, 1977); *Tonsic v Wagner*, 458 Pa 246; 329 A2d 497 (1974); *Dickerson v American Sugar Refining Co*, 211 F2d 200 (CA 3, 1954); Restatement Agency, 2d, § 226, p 498.

disposition is appropriate only where there is no genuine issue of material fact. However, where there is a disputed question of agency, any evidence, either direct or inferential, which tends to establish an agency relationship creates a question of fact for the jury to determine.[35] The facts of this case, with respect to the purported agency relationship between Dr. Sauer and St. Lawrence, have yet to be developed. As the case now stands, it cannot be said as a matter of law that an agency relationship did not exist and therefore a question exists to submit to the jury regarding whether Dr. Sauer retained such a relationship with St. Lawrence, a nongovernmental entity.

### D

We emphasize that our consideration of subsection 7(2) as it pertains to the instant case does not alter the important policy directive mandated by the Legislature when it enacted the governmental tort immunity statute. Rather, our examination of the governmental tort immunity statute reveals that although the Legislature extended immunity to a large number of individuals for broad categories of conduct, there is no indication that the statute, when read in conjunction with its definitional sources, even remotely contemplates a grant of immunity for agents who are simultaneously serving a private entity.

### IV

Consistent with the foregoing considerations, and accepting plaintiff's well-pleaded allegations, we hold

---

[35] *Meretta v Peach*, 195 Mich App 695, 697; 491 NW2d 278 (1992); *Jackson v Goodman*, 69 Mich App 225, 230; 244 NW2d 423 (1976), citing *Miskiewicz v Smolenski*, 249 Mich 63, 70; 227 NW 789 (1929).

that a material question of fact remains for trial. The
record establishes that Dr. Sauer had staff privileges
at St. Lawrence Hospital, treated a number of private
patients there on an "on call" basis, and at the time of
the alleged negligence was treating Janet Vargo as a
private patient at the "Michigan State University/St.
Lawrence Family Practice Residency Program." We
believe that irrespective of Dr. Sauer's performance of
a governmental function, a question of fact exists
with regard to whether Dr. Sauer was simultaneously
operating as an agent of St. Lawrence Hospital.
Therefore, and in accordance with the Court of
Appeals dissenting opinion, we reverse the judgment
of the Court of Appeals and remand this case to the
circuit court for further proceedings limited to plain-
tiff's claim of medical malpractice arising from Dr.
Sauer's activities as an agent of St. Lawrence Hospital
or the Michigan State University/St. Lawrence Family
Practice Residency Program.

MALLETT, C.J., and BOYLE, WEAVER, and TAYLOR, JJ.,
concurred with BRICKLEY, J.

CAVANAGH, J. (*concurring*). I agree with parts I and
III of the majority opinion. However, I would not
reach the constitutional issue because, as we have
stated previously, "there exists a general presumption
by this Court that we will not reach constitutional
issues that are not necessary to resolve a case." *Booth
Newspapers, Inc v Univ of Michigan Bd of Regents*,
444 Mich 211, 234; 507 NW2d 422 (1993); *Taylor v
Auditor General*, 360 Mich 146, 154; 103 NW2d 769
(1960).

Additionally, I write separately to note that because
the majority remands the case on the dual-agency the-

ory, we have not addressed plaintiff's concerns regarding informed consent. As she noted in her brief, plaintiff's decedent had no notice that Dr. Sauer was an agent, at least in one capacity, of Michigan State University and was shielded by governmental immunity. This is especially true where, here, she was being treated at a private hospital. While a statute typically puts one on notice of governmental immunity, this plaintiff did not have actual or constructive knowledge that the physician who was treating her was not a private physician, but instead was a Michigan State University physician cloaked with immunity.

KELLY, J., concurred with CAVANAGH, J.