*If this opinion indicates that it is "FOR PUBLICATION," it is subject to revision until final publication in the Michigan Appeals Reports.*

# STATE OF MICHIGAN

# COURT OF APPEALS

MARK W. DOBRONSKI,

        Plaintiff-Appellant,

v

NPS, INC., doing business as VEHICLE
PROTECTION CENTER,

        Defendant,

and

ENSURETY VENTURES, LLC, doing business as
OMEGA AUTO CARE,

        Defendant-Appellee.

UNPUBLISHED
April 21, 2022

No. 356617
Washtenaw Circuit Court
LC No. 19-000836-NZ

Before: BOONSTRA, P.J., and M. J. KELLY and SWARTZLE, JJ.

PER CURIAM.

Plaintiff Mark Dobronski allegedly received a series of illegal telemarketing calls from defendant NPS, Inc., doing business as Vehicle Protection Center. NPS sold vehicle-service contracts on behalf of defendant Ensurety Ventures, LLC, doing business as Omega Auto Care. Dobronski sued NPS and Omega under both state and federal law based on the telemarketing calls. NPS is not a party on appeal, but Dobronski argues Omega is liable for the telemarketing calls because NPS was acting as Omega's agent when it made the calls. The trial court disagreed with Dobronski and granted summary disposition to Omega. It also denied Dobronski's motion for continuance related to the motion for summary disposition and a subsequent motion for reconsideration. We affirm.

## I. BACKGROUND

Omega sells vehicle-service contracts through the use of intermediary call centers such as NPS. Both companies were incorporated in Missouri. The parties' relationship was governed by

a contract, called the Seller Agreement. Biff McCullough signed the Seller Agreement for NPS. The Seller Agreement lists two dates: January 8, 2017, and January 8, 2018. Brian Fox, one of Omega's owners, asserted in his deposition that the Seller Agreement was signed on January 8, 2018; there appears to be no genuine issue of fact with regard to this matter, so the latter date will be accepted as true.

The Seller Agreement provided that NPS would call prospective customers and attempt to sell Omega's vehicle-service contracts to them. Under the Seller Agreement, NPS agreed that it would not "solicit or market directly to any customer under any of the following circumstances":

> 1) Through the use of prerecorded, auto dialed or voice messaging systems to any phone number (voice blasting).
>
> 2) To contact any customer on a "do not call list" of any type.
>
> 3) To contact any customer on a cell phone without prior consent (violation of Title 47).
>
> 4) To contact any customer by any other means that is in violation of any state or federal laws, rules or regulations.
>
> 5) To indemnify and pay all fines imposed on [Omega] due to a violation by [NPS] of any of the above marketing rules, laws and regulations.

The vehicle-service contracts NPS sold for Omega were "on a form approved in writing by [Omega]." The contracts were required to conform with Omega's "then current rate chart" as well as Omega's policies and regulations. NPS was also required to transfer funds to Omega on set dates. The Seller Agreement additionally provided that

> [NPS] shall, at all times and in all cases, observe and obey . . . all written rules, regulations, instructions, and other directions not in conflict with this Agreement as [Omega] may from time to time, promulgate for its operation, and has no authority to bind [Omega] in contravention of any such rules, regulations, instructions, or directions.

In September 2018, a Missouri federal court enjoined McCullough and another business he was associated with from making automated telemarketing calls. *Frank v BMOCorp, Inc*, Case No. 4:17-CV-00870-RWS (ED Mo, September 12, 2018). McCullough's counsel in that was case was the same attorney that would later represent Omega in this case at the trial-court level.

A few months after the federal-court injunction, Dobronski—whose cell phone number had been on the national do-not-call registry since at least 2004—allegedly received an automated telemarketing call from an individual claiming to be from the "Vehicle Processing Center." The person attempted to sell an extended vehicle warranty through Omega to "August Livernois" for a 2014 Dodge Grand Caravan. The record does not identify August Livernois or his connection to Dobronski. Dobronski allegedly received 35 such calls between April 3, 2019 and June 28, 2019; each phone call was received from "spoofed" telephone numbers. Dobronski purchased a vehicle-protection plan on April 30, 2019. The plan stated that it was a "Vehicle Service

Agreement" from "Omega Auto Care" to August Livernois for a 2014 Dodge Grand Caravan. "Vehicle Protection Center" was also identified on the document.

In August 2019, Dobronski filed a seven-count complaint asserting violations of the federal Telephone Consumer Protection Act of 1991, 47 USC 227 *et seq*., and Michigan's Home Solicitation Sales Act, MCL 445.111 *et seq*. Dobronski alleged that defendants violated the acts by using a "spoofed" caller identification calling a telephone number on the federal do-not-call registry, calling him after he asked not to receive any more calls, and using automated dialing systems and prerecorded voice messages. Dobronski sought $187,750 in statutory damages, plus costs and interest. Because NPS and Omega did not respond to the complaint, Dobronski successfully sought a default judgment of $188,025. Dobronski sought and obtained a writ of garnishment against Omega.

Subsequently, Dobronski and Omega stipulated to vacate the default judgment against Omega, and Omega answered Dobronski's complaint. Omega denied engaging in any unlawful activity under the Telephone Consumer Protection Act or the Home Solicitation Sales Act. Omega asserted that Dobronski's alleged damages were caused in whole or in part by third parties over whom Omega had no control.

NPS became uncollectable and went out of business while the case was proceeding through the trial court. McCullough incorporated a new call center in Missouri called CIC Enterprises, Inc., on November 21, 2019. Subsequently, Omega entered into a contractual relationship with CIC Enterprises to sell Omega's vehicle-service contracts.

Fox was deposed during discovery. According to Fox, Omega did not make any telemarketing calls because it contracted that work out; Fox also testified that he was not aware of NPS making any illegal telemarketing calls. Additionally, Fox testified that he asked McCullough about the complaint in this case after he received it. According to Fox, McCullough claimed he did not know what Fox was talking about and said he would get back to Fox about it. The following colloquy then ensued between Dobronski and Fox:

> *Q.* Did [McCullough] ever get back to you?
>
> *A.* No, he has not.
>
> *Q.* And I assume that conversation took place back in August of 2019?
>
> *A.* That's correct.
>
> *Q.* So one year ago? He hasn't communicated with you? Are you aware that NPS, Inc. doing business as Vehicle Protection Center allowed this lawsuit to go into default and that a default judgment was entered against them by the Court for—for 187,759-some dollars?
>
> *A.* Yes, I am aware.

Omega moved for summary disposition under MCR 2.116(C)(8) and (C)(10). Omega argued that summary disposition under subrule (C)(8) was appropriate because Dobronski had not

alleged the existence of an agency relationship between Omega and NPS that would allow Omega to be held liable for NPS's alleged violations of federal and state telephone-solicitation laws. Omega argued that summary disposition under subrule (C)(10) was appropriate because undisputed record evidence established that any telephone solicitations received by Dobronski were made by NPS, and that Omega's Seller Agreement with NPS expressly prohibited the use of any of the telemarketing practices that Dobronski alleged NPS had used, or any other practices in violation of any state or federal laws. The hearing on Omega's motion was scheduled for December 16, 2020.

On December 9, Dobronski moved for a continuance of the hearing. Dobronski asserted that, because he had COVID-like symptoms over the past 24 to 48 hours and his primary-care physician had directed him to self-quarantine for 10 to 14 days, he was "unable to meaningfully prepare for and participate in the motion hearing." Dobronski asked the trial court to schedule the hearing sometime in early 2021. Omega opposed the motion, arguing that a hearing was unnecessary. The trial court denied Dobronski's motion.

The trial court subsequently granted Omega's motion for summary disposition on December 15, the day before the hearing was scheduled to take place, "for the reasons stated by [Omega] in its Motion and Brief in Support of Motion for Summary Disposition." Dobronski filed an untimely response to Omega's motion for summary disposition approximately eight hours later. Dobronski argued that even if Omega did not make the solicitation calls at issue, it was vicariously liable for NPS's violations of state and federal telemarketing laws under a range of agency principles, including actual agency, apparent agency, and ratification.

Subsequently, Dobronski moved for rehearing or reconsideration of the trial court's summary-disposition order and its order denying his motion for a continuance. The motion for reconsideration was decided by a new judge after the original trial judge retired. The trial court acknowledged Dobronski's contention that the original trial judge could not have reviewed Dobronski's arguments and evidence before signing the summary disposition order, and stated that, for this reason, the trial court had re-reviewed Omega's summary disposition motion, Dobronski's response, and the entire court file. Nevertheless, the trial court denied Dobronski's motion for rehearing or reconsideration. This appeal followed.

II. ANALYSIS

"We review de novo a trial court's decision to grant or deny a motion for summary disposition." *Sherman v City of St Joseph*, 332 Mich App 626, 632; 957 NW2d 838 (2020) (citations omitted). MCR 2.116(C)(8) mandates summary disposition if "[t]he opposing party has failed to state a claim on which relief can be granted." *Harbor Watch Condo Ass'n v Emmet Co Treasurer*, 308 Mich App 380, 384; 863 NW2d 745 (2014). A motion for summary disposition under MCR 2.116(C)(10) tests the factual sufficiency of a complaint. *Joseph v Auto Club Ins Ass'n*, 491 Mich 200, 205-206; 815 NW2d 412 (2012). This Court reviews a motion brought under MCR 2.116(C)(10) "by considering the pleadings, admissions, and other evidence submitted by the parties in the light most favorable to the nonmoving party." *Patrick v Turkelson*, 322 Mich App 595, 605; 913 NW2d 369 (2018). Because we consider matters outside of the pleadings, we will review Omega's motion under MCR 2.116(C)(10).

The Telephone Consumer Protection Act and the Home Solicitation Sales Act both prohibit certain types of telemarketing calls. For example, they both prevent automated calls and calls to individuals on the federal do-not-call registry. 47 USC 227(b)(1)(A)(*iii*); 47 CFR 64.1200(a)(1)(*iii*), (c)(2), and (e); MCL 445.111a(1) and (5). Both acts also provide a private right of action that imposes fines for violations of the acts. 47 USC 227(b)(3); MCL 445.111c(3).

Dobronski argues that he received telemarketing calls from NPS that violated both acts, but he does not argue that Omega made any of the allegedly illegal telemarketing calls. Indeed, nothing in the record suggests that Omega actually called Dobronski. Rather, Dobronski argues that NPS acted as Omega's agent when NPS called Dobronski and, therefore, Omega is liable for NPS's actions. Omega concedes, for the purposes of this appeal, that NPS called Dobronski in violation of the Telephone Consumer Protection Act and the Home Solicitation Sales Act. Accordingly, the primary issue before us is a narrow one: can Omega be vicariously liable for NPS's actions? We address the federal Telephone Consumer Protection Act before turning to the state Home Solicitation Sales Act.

## A. THE TELEPHONE CONSUMER PROTECTION ACT

Dobronski argues that Omega is liable under the Telephone Consumer Protection Act because NPS acted as Omega's agent when it called him in violation of the Act. Faced with a nearly-identical question in 2010, the United States Court of Appeals for the Sixth Circuit referred the matter to the Federal Communications Commission under the doctrine of primary jurisdiction so the parties could seek a decision from the agency regarding the proper interpretation of the relevant statutory and regulatory provisions. *Charvat v EchoStar Satellite, LLC*, 630 F3d 459, 466-468 (CA 6, 2010). As a result of the parties' petitions, the Commission issued a declaratory ruling clarifying that a "seller is not directly liable for a violation of the [Telephone Consumer Protection Act] unless it initiates a call, but may be held vicariously liable under federal common law agency principles for a [Telephone-Consumer-Protection-Act] violation by a third-party telemarketer." *In the Matter of the Joint Petition Filed by Dish Network, LLC, the United States of America, & the States of California, Illinois, North Carolina, & Ohio for Declaratory Ruling Concerning the Tel Consumer Protection Act (TCPA) Rules*, 28 FCC Rcd 6574, 6582 (2013) (*Dish Network*). To initiate a call means to "take[] the steps necessary to physically place a telephone call." *Id*. at 6583. When addressing a seller's potential vicarious liability, the Commission explained that "a seller may be liable for violations by its representatives under a broad range of agency principles, including not only formal agency, but also principles of apparent authority and ratification." *Id*. at 6584. Although we are not bound by the Commission's ruling, we do find it persuasive. See *Jacqua v Canadian Nat'l R, Inc*, 274 Mich App 540, 546; 734 NW2d 228 (2007).

## 1. WHETHER NPS WAS OMEGA'S AGENT

The existence of an agency relationship is generally a question for the jury to decide. *Vargo v Sauer*, 457 Mich 49, 71; 576 NW2d 656 (1998). "An essential element of agency is the principal's right to control the agent's actions. Control is a concept that embraces a wide spectrum of meanings, but within any relationship of agency the principal initially states what the agent shall and shall not do, in specific or general terms." 1 Restatement Agency, 3d, § 1.01 comment f(1). The record shows that there exists a question of fact regarding whether an agency relationship existed between Omega and NPS. Omega had a certain degree of control over NPS's actions, but

that control was not complete. And yet, an agency relationship is not alone sufficient to impose liability on the principal for all of the acts of the agent, as we explore next. Thus, because this issue is not outcome determinative, we will assume for purposes of this appeal that an agency relationship existed.

## 2. ACTUAL AUTHORITY

Generally speaking, for a principal to be liable for the acts of its agent, the agent must have acted with actual or apparent authority, or the principal must have ratified the agent's actions. Beginning with actual authority, an agent acts with actual authority "when, at the time of taking action that has legal consequences for the principal, the agent reasonably believes, in accordance with the principal's manifestations to the agent, that the principal wishes the agent so to act." 1 Restatement Agency, 3d, § 2.01.

The Seller Agreement clearly stated that NPS could not make illegal telemarketing calls. There is nothing in the record to suggest that NPS and Omega had some kind of side agreement to get around the Seller-Agreement's terms. Accordingly, based on this record, NPS could not have reasonably believed that it acted within the Seller-Agreement's terms when it allegedly used an automated dialing system to make an uninvited call to Dobronski at a cell phone number listed on the DNC registry. See *Jones v Royal Admin Servs, Inc*, 887 F3d 443, 446 (CA 9, 2018).

Dobronski contends that the relevant terms in the Seller Agreement were a sham to provide legal cover should a lawsuit arise. Dobronski reasons that evidence that NPS acted as Omega desired and authorized it to act can be found by connecting the dots between the Seller Agreement; Omega's knowledge as of August 2019 that NPS made several unlawful telemarketing calls; and Omega's continued business relationship with McCullough through CIC Enterprises even when faced with evidence that a McCullough-controlled entity had earlier violated federal and state law. Dobronski contends that the evidentiary inferences, taken together, were sufficient to raise a genuine issue of material fact that precluded summary disposition.

While there is inferential smoke that Omega became aware of McCullough's alleged unlawful activity, the timing of that smoke does not assist Dobronski's case that there was fire in this case. For Dobronski's argument to prevail, Omega would have had to have been on notice of McCullough's alleged unlawful activities before NPS called Dobronski. There is no evidence in the record to support such an inference. That Omega contracted for telemarketing services from CIC Enterprises *after* Dobronski initiated his lawsuit against NPS does not reasonably lead to the inference that Omega authorized, or knew about, NPS's unlawful telemarketing techniques *before* the lawsuit. Although contracting with CIC Enterprises for telemarketing services going forward might support an inference that Omega was aware of improper conduct in some future case, it does not show what Omega authorized or knew about in the past. Accordingly, nothing in the record establishes that Omega gave NPS actual authority to employ unlawful telemarketing practices.

## 3. APPARENT AUTHORITY

"Apparent authority is the power held by an agent or other actor to affect a principal's legal relations with third parties when a third party reasonably believes the actor has authority to act on behalf of the principal and that belief is traceable to the principal's manifestations." 1 Restatement

Agency, 3d, § 203. "The apparent power of an agent is to be determined by the act of the principal and not by the acts of the agent." *Brainard v American Skandia Life Assurance Corp*, 432 F3d 655, 663 (CA 6, 2005) (cleaned up). *Dish Network* provides the following example of circumstances that might impose liability on a seller under a theory of apparent authority:

> [A]pparent authority may be supported by evidence that the seller allows the outside sales entity access to information and systems that normally would be within the seller's exclusive control, including: access to detailed information regarding the nature and pricing of the seller's products and services or to the seller's customer information. The ability by the outside sales entity to enter consumer information into the seller's sales or customer systems, as well as the authority to use the seller's trade name, trademark and service mark may also be relevant. It may also be persuasive that the seller approved, wrote or reviewed the outside entity's telemarketing scripts. Finally, a seller would be responsible under the [Telephone Consumer Protection Act] for the unauthorized conduct of a third-party telemarketer that is otherwise authorized to market on the seller's behalf if the seller knew (or reasonably should have known) that the telemarketer was violating the [Telephone Consumer Protection Act] on the seller's behalf and the seller failed to take effective steps within its power to force the telemarketer to cease that conduct. [*Dish Network*, 28 FCC Rcd at 6592 (footnotes omitted).]

Dobronski argued in the trial court, and maintains on appeal, that NPS acted with apparent authority because Omega gave NPS access to Omega's product pricing, allowed NPS to enter consumer information into Omega's systems, and permitted NPS to display Omega's trade name on the vehicle-service agreements that were sent to consumers. Although a jury might reasonably infer from this evidence that NPS was authorized to sell Omega's product, it does not raise a question of fact regarding whether Omega authorized NPS to make illegal telemarketing calls, particularly when viewed together with the Seller Agreement, or that Omega knew, or should have known, that NPS was making illegal telemarketing calls on its behalf. Additionally, apparent authority must come from a representation by the principal. Omega and Dobronski did not have any interaction during the telemarketing calls. Thus, Dobronski cannot establish that NPS acted with the apparent authority of Omega when it called him.

### 4. RATIFICATION

"Ratification is the affirmance of a prior act done by another, whereby the act is given effect as if done by an agent acting with actual authority." 1 Restatement Agency, 3d, § 4.01(1). A principal can ratify an act by "(a) manifesting assent that the act shall affect the person's legal relations, or (b) conduct that justifies a reasonable assumption that the person so consents." 1 Restatement Agency, 3d, § 4.01(2).

McCullough was enjoined in Missouri federal court in September 2018 from making illegal telemarketing calls. His attorney in that case also represented Omega at the trial-court level in this case. But nothing in the record establishes that Omega was aware of that case or McCullough's involvement in illegal telemarketing calls before this case began. Additionally, Omega entered into its contract with CIC Enterprises at some point after this case began. While that contract might suggest that Omega has turned a blind eye to illegal telemarketing calls, it would support a

forward-looking inference only and does not establish that Omega ratified NPS's alleged conduct in this case. Finally, Fox testified in his deposition that he was not aware of NPS making illegal marketing calls in the past. Without that knowledge, Fox could not have ratified NPS's actions. And nothing in the record suggests that anyone else from Omega was situated differently from Fox in that regard. Thus, the record before us does not show that Omega ratified NPS's conduct, even when considering the evidence in the light most favorable to Dobronski.

In summary, Dobronski cannot establish that Omega is vicariously liable under the Telephone Consumer Protection Act for NPS's allegedly unlawful telemarketing calls. Additionally, to the extent that Dobronski argues that Omega is directly liable for the violations, his argument conflates the concept of direct liability with his theory of actual authority. There is no record evidence that Omega itself initiated any of the unlawful calls that serve as the basis for Dobronski's complaint. See *Dish Network*, 28 FCC Rcd at 6582-6583. Thus, Omega is not directly liable under the Telephone Consumer Protection Act for the allegedly unlawful calls made by NPS.

## B. THE HOME SOLICITATION SALES ACT

Dobronski also argues that Omega is vicariously liable for NPS's violations of Michigan's Home Solicitation Sales Act. The act defines "telephone solicitor" to mean "any person doing business in this state who makes or causes to be made a telephone solicitation." MCL 445.111(n). As already noted, Dobronski has not presented evidence suggesting that Omega itself made unlawful phone calls, and the record evidence confirms that Omega did not "cause to be made" unlawful telephone calls. Agency law in Michigan mirrors federal law, and, for the same reasons set forth earlier, the record does not establish that NPS had authority to make unlawful calls to Dobronski on Omega's behalf. See *David v Serges*, 373 Mich 442, 443-444; 129 NW2d 882 (1964); *Persinger v Holst*, 248 Mich App 499, 505; 639 NW2d 594 (2001); *Hertz Corp v Volvo Truck Corp*, 210 Mich App 243, 246; 533 NW2d 15 (1995); *Alar v Mercy Mem Hosp*, 208 Mich App 518, 528; 529 NW2d 318 (1995). Although NPS very well may have violated the Home Solicitation Sales Act, Dobronski has presented no evidence from which a reasonable jury could infer that Omega made or caused the alleged violations.

Because Dobronski has failed to present evidence establishing a genuine issue of material fact regarding whether Omega is directly or vicariously liable for violations of the Telephone Consumer Protection Act, or caused to be made telephone solicitations in violation of the Home Solicitation Sales Act, we affirm the trial court's order granting summary disposition in favor of Omega.

## C. REMAINING ISSUES

Finally, Dobronski argues that the trial court abused its discretion by not granting his request to adjourn the hearing on Omega's motion for summary disposition until after the new year. Dobronski also argues that the trial court abused its discretion by denying his motion for reconsideration of the trial court's summary disposition decision. Based on our review of the record and applicable law, we conclude that the trial court did not abuse its discretion in either instance.

## III. CONCLUSION

For the reasons stated in this opinion, we affirm the trial court's orders granting summary disposition to Omega, denying Dobronski's motion for continuance, and denying Dobronski's motion for reconsideration and rehearing.

/s/ Mark T. Boonstra
/s/ Michael J. Kelly
/s/ Brock A. Swartzle